STATE OF NORTH CAROLINA, ex rel. UTILITIES COMMISSION, MEDFIELD-KINGSBROOK HOMEOWNERS' ASSOCIATION, HIDDEN VALLEY CIVIC ACTION GROUP WATER COMMITTEE, DEVELOPMENT ASSOCIATES, INC., AND JOHN E. ALDRIDGE, JR. v. HEATER UTILITIES, INC., APPLICANT

No. 55

(Filed 5 November 1975)

1. Utilities Commission § 6— water rates — rate base — contributions by patrons in aid of construction

The term, "the public utility's property used and useful in providing the service," appearing in G.S. 62-133 (b) (1), does not include that portion of the utility plant in service represented by contributions made by the utility's patrons in aid of construction; therefore, the Utilities Commission properly excluded from the rate base of a water utility the amount of contributions in aid of construction made directly by patrons of the water utility.

2. Utilities Commission § 6— water rates — rate base — difference between cost to developer and price paid by utility — contributed plant

The Utilities Commission did not err in excluding from the rate base of a water utility an amount representing the difference between the original cost of a water system constructed by the developers of a

real estate subdivision and the price paid to such developers by the water utility where the Commission found that such difference amounted to an indirect payment from the customers to the utility through the purchase of their lots, which allowed the original owners to sell the water system to the utility for less than the probable cost of installation.

**3. Utilities Commission § 6— utility rates — purpose of allowance for depreciation**

The purpose of the annual allowance for depreciation of a public utility's property and the resulting accumulation of a depreciation reserve is not to provide the utility with a fund by which it may purchase a replacement for the property when it is worn out, but is to enable the utility to recover the cost of such property to it.

**4. Utilities Commission § 6— water rates — operating expenses — depreciation of contributed plant**

The Utilities Commission did not err in its refusal to allow a water utility to make an annual charge to operating expenses for the depreciation of properties representing contributions in aid of construction.

APPEAL by Heater Utilities, Inc., from the judgment of the Court of Appeals, reported in 26 N.C. App. 404, 216 S.E. 2d 487, affirming the order of the North Carolina Utilities Commission fixing rates to be charged by Heater Utilities, Inc., for water.

Heater Utilities, Inc., is a public utility supplying water in twenty service areas in North Carolina. It applied to the North Carolina Utilities Commission for approval of revised rate schedules. Intervenors appeared before the Commission in opposition. Following a hearing, the Commission made findings of fact and entered its order fixing rates designed to yield to the applicant a return of 11 per cent on its rate base, as determined by the Commission.

At the hearing the applicant, pursuant to G.S. 62-133.1(a), elected to have its rates for service fixed by the Commission in accordance with G.S. 62-133(b); i.e., by determining the fair value of its property, used and useful in providing water service, and fixing rates such as will enable it to earn thereon, in addition to reasonable operating expenses, including a proper allowance for depreciation, a fair profit as defined by that statute.

At the time of the hearing the company's operations in thirteen of its twenty service areas had been so recently begun that the Commission concluded that the rates to be charged

by the company should be "fixed on the basis of the operating results for seven (7) dominant systems which were in operation during the entire test year and that the thirteen (13) other systems, which were operated at far less than capacity, should be excluded for the purposes of fixing rates in this case." The appeal presents no objection to this procedure.

The Commission found that the reasonable original cost of the company's utility plant serving the seven areas was $579,045. The appeal presents no objection to this finding. There being no evidence in the record as to the replacement cost of such properties, the Commission determined the fair value of the properties to be the original cost less the accumulated depreciation reserve. This appeal presents no objection to that determination. To the fair value so determined the Commission added an allowance for working capital. This appeal presents no objection to the determination of that allowance.

From the total thus reached the Commission then subtracted two amounts, $175,591 and $242,164, on the ground that these amounts represented contributions to construction made by the patrons of the company and thus determined that the rate base of the company was $124,472. This appeal presents no objection to the computation of any of these amounts or to the Commission's determination that a rate of return of 11 per cent is fair, its determination of the company's gross revenues for the test period under the existing rates, its determination of the company's operating expenses for the test period (other than depreciation allowance) or its determination of the revenues which will be produced by the approved rates for service.

The only questions presented by this appeal are these:

(1) Did the Commission exceed its authority in determining the rate base by subtracting from the "fair value" of the properties constituting the company's plant in service the two above mentioned amounts designated "contributions in aid of construction"?

(2) Did the Commission exceed its authority in fixing the annual charge for depreciation by excluding from the depreciable properties these "contributions in aid of construction"?

The record on appeal does not contain the evidence introduced at the hearing before the Commission. The nature of the

properties treated as "contributions in aid of construction" and the source from which the company derived these properties are not clearly set forth in the record. From the meager discussion of these items in the order of the Commission, the briefs of the parties and the agreed "Statement of Fact" in the record on appeal, it appears that the $175,591 represents items such as water lines constructed by patrons of the company and conveyed by them to the company without charge, or constructed by the company with funds supplied to it by such patrons without charge or obligation of repayment, title to all such properties being now vested in the company. It further appears, from the same sources, that the item of $242,164 represents the excess of the cost of construction of water mains and other plant items, constructed by developers of real estate subdivisions, for the purpose of making possible a supply of water to lots in such subdivisions, over the price at which the developers sold these facilities to Heater Utilities, Inc., after the sale of such lots to the present patrons of the company, or their predecessors in title. The Commission took the view that "the only logical and reasonable inference which can be drawn from the evidence herein is that the $242,164 amounts to an indirect payment from the customers to Heater through the purchase price of their lots, which allowed the original owners of the systems to sell them to Heater for amounts far less than the probable cost of installation."

The agreed "Statement of Fact" in the record on appeal asserts that the Uniform System of Accounts for Class A and B Water Utilities, as issued by the National Association of Regulatory Utility Commissioners, defines contributions in aid of construction as "donations or contributions in cash, services or property from states, municipalities or other governmental agencies, individuals and others for construction purposes." Nothing in the record indicates that any of the properties in question, or the funds with which they were acquired, were derived by the company from any governmental agency.

*Parker, Sink & Powers by Henry H. Sink for applicant appellant.*

*Robert F. Page, Assistant Commission Attorney, for North Carolina Utilities Commission.*

*Weaver, Noland & Anderson by William Anderson for appellees.*

LAKE, Justice.

A typical "contribution in aid of construction" occurs under the following circumstances: An individual or group of individuals desiring service from a water, gas, electric, telephone or other public utility company is located so far from the company's existing main or line that the company is unwilling to bear the expense of constructing the necessary extension of its facilities and the regulatory commission is unwilling or unable to compel it to do so. The company agrees to render service if the person or persons desiring it will pay all or part of such cost of construction. This they do, title to the newly constructed facility passing to the company which, expressly or impliedly, agrees to use such facility in supplying service to such patrons and their successors in interest. The facility so constructed is thereafter used and maintained by the company just as are similar facilities constructed entirely with company funds, the cost of such maintenance being a proper operating expense of the company. The amount so paid by the patron or patrons for the construction of the facility is entered on the books of the company under the caption, "Contributions In Aid Of Construction," or some similar designation.

Heater Utilities, Inc., now contends that since such facilities are owned by it and are used by it in rendering its service the fair value thereof should be included in its rate base by virtue of G.S. 62-133 (b) (1) which provides that in fixing rates the Utilities Commission shall "ascertain the fair value of the public utility's property use and useful in providing the service rendered to the public within this State." The overwhelming majority of the regulatory commissions throughout the country have taken the contrary view.

In 1 Priest, Principles of Public Utility Regulation, p. 177, it is said, "court and commission decisions holding that contributions in aid of utility construction must be excluded from rate base have been so uniform as probably not to require detailed citation." A representative sampling of such commission opinion is found in the following commission decisions: *Re Southern California Edison Co.* (California), 6 P.U.R. (3d) 161; *Re Peoples Gas System* (Florida), 45 P.U.R. (3d) 449; *Re Peoples Gas Light & Coke Co.* (Illinois), 27 P.U.R. (3d) 209; *Re Indiana Gas & Water Co.* (Indiana), 35 P.U.R. (3d) 32; *Public Utilities Commission v. Portland Water District* (Maine), 76 P.U.R. (N.S.) 135; *Re Pittsfield Coal Gas Co.* (Massachu-

setts), 3 P.U.R. (3d) 1; *Re Northern Power Co.* (Michigan), P.U.R. 1933C 128; *Re Hungry Horse Water Co.* (Montana), 79 P.U.R. (N.S.) 172; *Re Princeton Water Co.* (New Jersey), 90 P.U.R. (N.S.) 181; *Public Utility Commission v. Pennsylvania Power & Light Co.* (Pennsylvania), 14 P.U.R. (3d) 438; *Re Citizens Utilities Co.* (Vermont), 90 P.U.R. (N.S.) 46; *Re Commonwealth ex rel. Rosslyn Gas Co.* (Virginia), 3 P.U.R. (N.S.) 61; *Re Village of Mount Horeb* (Wisconsin), 14 P.U.R. (N.S.) 181; *Re Northern Natural Gas Co.* (Federal Power Commission), 30 P.U.R. (3d) 123. In most of these commission orders there has been little or no discussion of the basis for the subtraction of contributions in aid of construction from the original cost of the total plant in service in determining the utility's rate base, the several commissions tending to treat the matter as axiomatic.

There have been relatively few decisions by the courts of the states relating to this question, due perhaps to the fact that, in most cases, contributions in aid of construction are relatively small in proportion to the total value of the plant in service. However, substantially all of the cases which have been brought to our attention have affirmed such action by the regulatory commissions. *Pichotta v. Skagway*, 78 F. Supp. 999 (D. Ct. Alaska); *DuPage Utility Co. v. Illinois Commerce Commission*, 47 Ill. 2d 550, 267 N.E. 2d 662, cert. den., 404 U.S. 832; *City of Hagerstown v. Maryland Public Service Commission*, 217 Md. 101, 141 A. 2d 699; *United Gas Corp. v. Miss. Public Service Commission*, 240 Miss. 405, 127 So. 2d 404; *Princess Anne Utilities Corporation v. Commonwealth of Virginia ex rel. State Corporation Commission*, 211 Va. 620, 179 S.E. 2d 714; *City of St. Francis v. Public Service Commission*, 270 Wis. 91, 70 N.W. 2d 221. See also, *Langan v. West Keansburg Water Co.*, 51 N.J. Super. 41, 143 A. 2d 185.

In the case of the City of Hagerstown, supra, the Maryland Court explained the basis for its decision as follows:

"The rationale of the Commission's exclusion from the rate base of contributions in aid of construction in the instant case * * * and the rationale of the many decisions of Commissions of other States reaching a like result is, in essence, that it is inequitable to require consumers to pay to the utility a return on property which they, not the utility, have paid for. Such a result may be supported, not only as a matter of rather obvious fairness, but also as a

matter of perhaps somewhat technical theory, in spite of the fact that the utility holds legal title to the contributed property, on the ground that the contributed property is subject to contractual rights in favor of those who furnished it * * * which place the beneficial use of the property in those who, from time to time, own the lots, houses, factories or lands which the water company (in this case the City) has agreed to serve, so that the value of the water company's bare legal title is nothing. In other words, the water company (here the City) is simply in the position of a trustee, holding legal title to the contributed property for the benefit of those with whom it has contracted, or their successors in interest."

In the case of the Princess Anne Utilities Corporation, supra, the Virginia Court said:

"In excluding contributions in aid of construction from rate base, the Commission followed, and we think properly so, what is the near-universal rule in public utility rate cases. * * *

"But aside from the fact that the just-cited rule is the one generally followed, there is another consideration prompting its adoption. The rule is based on principles of fairness. It is inequitable to require utility customers to pay a return on property for which they, not the utility, have paid."

[1] The question is one of first impression in this Court. We are persuaded by the reasoning of the Maryland and Virginia Courts and the obviously widespread acquiescence of public utility companies throughout the nation in this long established administrative application of rate making statutes similar to G.S. 62-133. We, therefore, hold that the term, "the public utility's property used and useful in providing the service," appearing in G.S. 62-133(b)(1), was not intended by the Legislature to include that portion of the utility plant in service represented by contributions made by the utility's patrons in aid of construction.

Heater Utilities, Inc., relies upon the statement by Mr. Justice Butler in *Board of Commissioners v. New York Telephone Co.*, 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808, that "constitutional protection against confiscation does not depend on the source of the money used to purchase the property." We agree

with the Maryland Court in the case of the City of Hagerstown, supra, that the New York Telephone Company case, supra, is distinguishable from the one now before us. There the question for the Supreme Court of the United States was the right of a regulatory commission to exclude from the utility's rate base property acquired through the expenditure of excessive earnings in former years. Such earnings, though excessive, clearly belong to the utility with no strings attached, and may be used by it for the payment of dividends or any other corporate purpose. They are not supplied by the utility patrons pursuant to any contract, express or implied, for the extension of the utility's service. Property acquired by the use of such funds, therefore, is not analogous to property affected by a trust for the benefit of the patrons from whom the excess profits were derived, nor is it analogous to property acquired by an outright, unrestricted gift.

Heater Utilities, Inc., also relies upon *City of Covington v. Public Service Commission of Kentucky,* 313 S.W. 2d 391. There the Kentucky Court held that the regulatory commission could not exclude from the rate base of a city, furnishing water outside the city limits, property purchased with the proceeds of a P.W.A. grant from the Federal Government. In that case, however, the Kentucky Court said, "The question of whether *consumer* contributions may be included in a rate base is not before us, and we do not decide it."

In 1 Priest, Principles of Public Utility Regulation, p. 177, it is said:

"The Maine public utilities commission has distinguished between (1) contributions made by customers and (2) grants from the Federal Government, saying that the former should be eliminated from rate base, but that ' * * * government grants are in a different category and should not be deducted.' Much would seem to depend on the purpose of governmental contributions. If they are made to induce investors to put their money into utility securities, which must have been true of grants made when such enterprises were pioneer developments, they plainly should *not* be deducted from rate base."

We do not have before us, and express no opinion as to the authority of the North Carolina Utilities Commission to exclude from the rate base of a public utility property repre-

sented by a grant from a governmental agency to aid the construction of the utility plant. We hold that the exclusion by the Commission in the present case of the item of $175,591 from the rate base on account of contributions in aid of construction made directly by patrons of the utility company was not in excess of the authority of the Utilities Commission.

[2]  Heater Utilities, Inc., contends that, nevertheless, the deletion from the rate base of the item of $242,164 was improper for the reason that this amount was not contributed to it by the patrons of the company but represents the difference between the original cost of the water system constructed by the developers of the real estate subdivision and the price paid to such developers by Heater Utilities, Inc.

This question was decided adversely to the company by the Maryland Court in the City of Hagerstown case, supra, by the Illinois Court in the DuPage case, supra, and by the Virginia Court in the Princess Anne Utilities Corporation case, supra. The Maryland Court said:

> "In the instant case, as we understand the facts, much of the property involved in this dispute was acquired by the City pursuant to agreements between the City and developers of real estate subdivisions, under which the developers paid all or part of the cost of mains and hydrants and of their installation and the City agreed to furnish water to the subdivisions. We think that it makes no difference, so far as this case is concerned, whether these payments were made in the first instance by the developers or by the purchasers of lots. We may observe in passing that we have no doubt that any such costs originally paid by the developers were passed on to the Purchasers in the form of increased prices for lots, and that the purchasers or other successors in interest are the persons who must pay the water rates."

The Virginia Court said:

> "It makes no difference * * * in the view we take of the case, whether the contributions to the utility company were made initially by the customers or by the land development companies, or whether some of the latter were closely related to the utility company. The controlling factor is whether the utility company's customers ultimately bore the cost of such contributions.

"It is true that there was no actual testimony before the Commission relating to what items made up the prices of the homes purchased by those who became customers of the utility company. But it would be wholly unrealistic to say that the costs of the sewerage facilities contributed by the land development companies were not passed on to those customers."

In the present case the North Carolina Utilities Commission said in its order, "The only logical and reasonable inference which can be drawn from the evidence herein is that the $242,164 amounts to an indirect payment from the customers to Heater through the purchase price of their lots, which allowed the original owners of the systems to sell them to Heater for amounts far less than the probable cost of installation." This being true, we find no basis for making a distinction between the typical contribution in aid of construction, made directly by the patron of the utility, and the contribution made to the utility by the real estate developers through their sale to it of the facilities in question at a price substantially less than the installation cost of such facilities. We, therefore, hold that the Commission did not exceed its authority in excluding from the rate base this item of $242,164.

[3, 4] The remaining question presented by this appeal is whether the Commission erred in its refusal to allow the utility company to make an annual charge to operating expenses for the depreciation of the properties representing such contributions in aid of construction. We hold that it did not err in so doing. The purpose of the annual allowance for depreciation and the resulting accumulation of a depreciation reserve is not, as is sometimes erroneously supposed, to provide the utility with a fund by which it may purchase a replacement for the property when it is worn out. The purpose of the allowance is to enable the utility to recover the cost of such property to it. In *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co.,* 239 N.C. 333, 346, 80 S.E. 2d 133, this Court said:

"For rate-making purposes a public utility is allowed to deduct annually as an operating expense so much of its capital investment as is actually consumed during the current year in rendering the service required of it. But the cost represents the amount of the investment, and it is the actual cost, not theretofore recouped by depreciation deductions, that must constitute the base for this allowance."

The wearing out or obsolescence of a machine or pipeline is an expense of operation as truly as is the consumption of fuel or other supplies instantly consumed in the operation of the utility plant. The cost of a ton of coal is charged to the operating expense of the company in the year in which such coal is used. The cost of more durable equipment must be spread over the life of the equipment, but the annual charge for its depreciation is the proportionate part of the company's investment in that property.

G.S. 62-133 (b) (3) directs the Commission, in fixing utility rates, to "ascertain such public utility's reasonable operating expenses, including *actual investment* currently consumed through reasonable actual depreciation." (Emphasis added.) The statute clearly directs that the annual allowance for depreciation of durable properties, such as a pipeline, be based upon the original cost of the property to the utility and not upon either its current fair value or the cost of installation borne by a former owner, such as the real estate developers in the present case. There was, therefore, no error in the ruling of the Utilities Commission in the matter of the annual allowance for depreciation.

Affirmed.