STATE ex rel. MARTIGNEY CREEK SEWER COMPANY, Relator-Appellant,

v.

PUBLIC SERVICE COMMISSION of the State of Missouri, Respondent.

STATE ex rel. HOME BUILDERS ASSN. OF GREATER ST. LOUIS, Intervenor-Respondent-Relator-Appellant,

v.

PUBLIC SERVICE COMMISSION of the State of Missouri, Respondent.

STATE ex rel. ST. LOUIS COUNTY, Missouri, Intervenor-Respondent-Relator-Appellant,

v.

PUBLIC SERVICE COMMISSION of the State of Missouri, Respondent.

No. 58987.

Supreme Court of Missouri, En Banc.

May 5, 1976.

Rehearing Denied June 14, 1976.

See also Mo., 537 S.W.2d 400.

Louis A. Robertson, Robertson, Ely & Wieland, St. Louis, for relators.

Dominic Troiani, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Thomas W. Wehrle and Robert H. Grant, Clayton, for appellants.

Leland Curtis, General Counsel, Paul W. Phillips & David L. Smith, Asst. General Counsel, General Counsel to the Missouri Public Service Commission, Jefferson City, for respondent.

BARDGETT, Judge.

This is an appeal from an order of the Public Service Commission of Missouri (PSC) which denied the rate increase sought by Martigney Creek Sewer Company (Martigney), a private sewer utility, and granted a lesser rate increase. Home Builders Assn. of Greater St. Louis (HBA) and St. Louis county participated in the PSC hearings as intervenors and generally opposed the rate increase sought by Martigney. The PSC order was affirmed by the circuit court of Cole county and Martigney, HBA, and St. Louis county appealed to the Missouri court of appeals, Kansas City district. After opinion by the court of appeals, this court transferred the appeal on applications of Martigney, HBA, and the PSC, pursuant to Art. V, sec. 10, Mo.Const., as amended. Substantial portions of the court of appeals opinion will be utilized without use of quotation marks.

The principal issues on this appeal involve the question of whether a donated plant, contributions in aid of construction, and certain "connection fees" may be included in the base for rate-making purposes. Martigney claims the PSC erred in not including in the rate base (1) the value of sewer lines (plant) deeded by land and subdivision developers, (2) the value of a sewer treatment plant built with connection fees paid to Martigney by the developers, and (3) accumulated depreciation of those facilities noted in (1) and (2) as an operation expense, all for rate-making purposes.

Martigney commenced doing business on January 3, 1956, of providing sanitary sewer facilities to an area in south St. Louis county which had formerly been of a rural

nature. The area had been developing for primarily residential use with some commercial use such as shopping centers. As of June 1, 1967, when Martigney, formerly a private sewer company, came under the jurisdiction of PSC by reason of the enactments of sections 386.020 and 386.250, RSMo 1969, it had 156,695 feet of various size sewer trunk lines, a one-million gallon per day processing plant, and a total of 1,911 customers served. Its charges to those customers were $2.00 per month, or $6.00 per quarter, for single-family residential service, and $12.50 per quarter minimum for commercial users. The "tap on" or connection fee of users was $250 each, this amount being one source of "contributions in aid of construction" of Martigney's sewer facilities which were disallowed by PSC in setting the rates.

As of December 31, 1970, the end of the "test year" selected for purposes of rate-making, Martigney's sewer lines had increased to 175,791 feet, and its customers served increased to about 2,487. There was testimony that plans were being formulated to add in the future either a one-million or a two-million gallon per day processing plant. On November 5, 1970, Martigney filed with PSC a proposed tariff and rate increase doubling rates to residential users, and increasing those of commercial users from $12.50 per quarter to $18.75 per quarter. In its final order, affirmed by the trial court, Martigney's rates were set at: Residential, $2.25 monthly; commercial, $18.75 quarterly; and connection fees, $250 per single-family residence, $175 apartments, and $500 commercial.

Martigney was one of four interrelated sewage companies. The others were Spanish Lake, St. Louis County Sewer Company, and Fenton Sewer Company. Mr. Ellsworth Breihan was the principal promoter of the residential developments in south St. Louis county, and in the creation of Martigney, which was owned one-half by his family and one-half by the family of Robert Joyce. It appears without question that the initial connection fees of $250 each, which were based upon the estimated cost of construction of trunk sewer lines and treatment plant facilities within the watershed of Martigney, were paid to it by subdivision developers who in turn added $250 to residential lot costs which were subsequently paid by home purchasers as a part of the original cost of construction. Some subdivision developers had constructed their own sewer lines and then deeded them to Martigney without cost. Other individuals had paid the $250 connection fee for sewers to their lots to Martigney. PSC found that the utility plant contributed by developers was $665,530 and that of that amount, $565,877 was built by connection fees (and donations) prior to June 1, 1967, and that utility plant contributed by developers and built by connection fees were, in this case, contributions in aid of construction.

PSC further found that Martigney received connection fees during the test year (ending December 31, 1970) of $40,470 which it treated as revenue on its books as it had done since June 1, 1967. During the test year the operating revenues, including connection fees, were $105,214. Under its proposed rates, Martigney would have an estimated operating revenue of $166,348, including connection fees, and under PSC's allowance of rates, that figure was estimated to be reduced to $113,365. After excluding (for rate-making purposes) a salary of $6,000 as operating expense of Mrs. E. B. Joyce, vice-president of Martigney, and making other adjustments of expenses which had been allocated on a proportionate basis among the four sewer companies, PSC found that Martigney had a net operating income of $11,856 for the test year; under its proposed rates it would have had an estimated net operating income of $45,852; and under the rates allowed by PSC, it would have a net operating income of $18,124. For common equity investment earnings, the figures were likewise computed, respectively, $7,904; $41,900; and $14,172. [Staff exhibit 2, and accompanying schedules, referred to in the record as being the basis for Staff's recommendations to PSC, is not among the exhibits in this case. In view of the disposition of this case, it is not, however, necessary to refer to that exhibit.]

In its first three points, which are related in attack upon PSC's ruling, Martigney urges that PSC acted in violation of sec. 393.270. It is first said that PSC disregarded the statutory requirement that due regard be given "to a reasonable average return upon the value of the property actually used in the public service." The same contention was advanced in *State of Missouri ex rel. Valley Sewage Company v. Public Service Commission*, 515 S.W.2d 845 (Mo.App.1974). It was there held that the assertion of the company, the same as here, would foreclose consideration of other salient language in subsec. 5, sec. 393.270, e. g., the following language, "[i]n determining *the price to be charged for sewer service* the commission may consider all facts which in its judgment have any bearing upon a proper determination of the question," and also the language, "with due regard, *among other things*," which immediately precedes "to a reasonable average return upon the value of the property actually used in the public service." (Italics added.) It was further held, citing and quoting *State ex rel. Missouri Water Co. v. Public Service Commission*, 308 S.W.2d 704, 718–719 (Mo. 1957), that "due regard, among other things" was not preclusive of other relevant factors; that it was the legislative intent that the Commission " 'consider all facts which in its judgment have any bearing upon a proper determination' of a sewage utility's rate base for the purpose of fixing authorized rates to be charged;" and the decision went on to hold on the ultimate issue that "where the customers and users of a utility have substantially paid for the facilities employed in the public service, the antithesis of a just and reasonable rate is one that would permit a utility's stockholders to recover a return on money which they, in fact, never invested." *Valley Sewage* and its cited case of *Du Page Utility Company v. Illinois Commerce Commission*, 47 Ill.2d 550, 267 N.E.2d 662 (1971), cert. den., 404 U.S. 832, 92 S.Ct. 74, 30 L.Ed.2d 62, rules the question adversely to Martigney. PSC's ruling that contributions in aid of construction should be excluded for rate-making purposes is correct.

There is, however, one aspect of error in PSC's treatment of contributions in aid of construction in that the PSC included tap-on or connection fees which Martigney received after June 1, 1967, and which Martigney thereafter treated as operating revenue in the base for rate-making purposes. This matter is presented by intervenors-appellants St. Louis county and HBA on their appeals. Although the record shows and PSC found that since June 1, 1967, Martigney had treated connection fees as operating revenue (apparently as the result of a dispute with Internal Revenue Service as to whether prior to that date connection fees were contributions in aid of construction or taxable revenue), sec. 393.140, subd. 4, provides that PSC shall "[h]ave power, in its discretion, to prescribe uniform methods of keeping accounts, records and books, to be observed by . . . sewer corporations." PSC's Account No. 271 provides, "Contributions in Aid of Construction. A. This account shall include donations or contributions in cash, services of property from states, municipalities, or other governmental agencies, individuals and others for construction purposes." In not excluding the connection fees clearly paid in cash after June 1, 1967, and used in the construction of sewer plant, PSC has ignored its own adopted rule of uniformity of accounts and books. Note the anomaly of the treatment of all connection fees as contributions in aid of construction in the companion *Spanish Lake* case, No. 58988. It is impossible to ascertain a rational basis, in view of PSC's rule, *and* the holding herein and in the *Valley Sewage* case, that donations and cash connection fees are contributions in aid of construction to be excluded as bases for rate-making purposes, that they should be treated differently because of time of receipt or how they were subsequently entered and handled on Martigney's books.

But there is a further and perhaps a more substantive reason why the connection fees received after June 1, 1967, cannot be included in the base for rate-making purposes. The connection or tap-on fees received after June 1, 1967, were paid by the

subdivider or homeowner to Martigney for exactly the same purpose as those paid prior to that date, a contribution in aid of constructing the sewers. It was not merely a charge to begin service. These connection fees paid for a physical asset—the sewer lines and, as such, were the same as if the subdivider or homeowner built the sewer and then gave it to Martigney.

The PSC said of connection fees: "A connection fee is not the same as donated property. It is paid in cash by a developer for each lot in his subdivision or by an individual customer who wishes to connect to the sewer system. In some cases it may have a relation to actual construction costs and in some cases not. It is a flat charge made to each customer. In any event, it does provide the Applicant with the money with which to build its plant without any investment by the Applicant. The Commission is of the opinion that for rate-making purposes a connection or tap-on fee can either be a Contribution in Aid of Construction or revenue depending on the facts in each case.

"In this case Applicant has treated its connection fees collected prior to June 1, 1967, as Contributions in Aid of Construction and post June 1, 1967, as revenue. Applicant has set its rates, conducted its business, dealt with its creditors and paid its income taxes on the basis that these fees were considered revenue after June 1, 1967.

"The Commission is of the opinion that for rate-making purposes under this set of facts, that the connection fees collected by Applicant prior to June 1, 1967, should be credited to the account for Contributions in Aid of Construction and that the fees collected after June 1, 1967 should be credited to the appropriate operating revenue account on a current basis. *To do otherwise in this case would necessitate such an unreasonably high increase in the monthly rates that it would shock the conscience of the public and this Commission.*

"The Commission is of the opinion that for rate-making purposes Contributions in Aid of Construction are to be deducted from the value of the property used and

useful in the public service. Ample precedent for such an exclusion is found in normal utility rate-making. It is simply inequitable to require utility customers to pay a return on property for which they, not the utility, have paid.

"In this case when the Contributions in Aid of Construction and the accumulated depreciation is deducted from the value of the plant in service the result is a negative rate base as found above. This is not unique in sewer rate cases."

■ It is clear that the PSC found the connection fees paid prior to and subsequent to June 1, 1967, to have been for exactly the same purpose and used in exactly the same way—a contribution in aid of construction. The only difference was the manner Martigney handled those fees in its books. The PSC's observation that a connection fee can be either a contribution in aid of construction or revenue depending on the *facts* in each case is obviously correct. If the fee is charged merely to compensate for work done or service performed in starting the service to the home, such as connecting a phone or opening a value or making a final hookup, then the charge does not purchase an asset. But, in this case, the PSC decided that these "connection fees" were, in fact, contributions in aid of construction and, in fact, not general revenue. In such a case the PSC cannot call those fees what they have decided they are not simply to *create* a rate base.

The concern of the PSC that if it considered connection fees received after June 1, 1967, as contributions in aid of construction and not revenue would necessitate an unreasonably high increase in the monthly rates is, we believe, unfounded. The PSC found that the capital structure of Martigney consists of common equity capital of $100,000 and that capital is the only investment the stockholders have in the Martigney corporation; that the contributions in aid of construction and the donated plant equal or surpass the value of the plant in service; that all of this plant was contributed by the rate payer either directly or indirectly.

By considering the connection fees received after June 1, 1967, as revenue, the PSC has done precisely what it has so strenuously attempted to avoid. It has put into the rate base the value of the sewers (plant) that were built with those connection fees. The net result is that the customers, having paid for the asset themselves with the connection fees (contributions in aid of construction), are required to pay again by being charged a rate the same as if they (customers) had not purchased the physical asset in the first place. In *Princess Anne Utilities Corp. v. Commonwealth of Virginia ex rel. S.C.C.*, 211 Va. 620, 179 S.E.2d 714 (1971), the first issue was whether contributions in aid of construction were properly excluded in determining the utility company's base for rate-fixing purposes. The utility contended that because the facilities were owned by the company it made no difference from where the facilities or the money to construct them came; that having donated the facilities to serving the public the utility was entitled to be paid at a fair rate for the use of its property. The Virginia Supreme Court disagreed holding at 716:

"In excluding contributions in aid of construction from rate base, the Commission followed, and we think properly so, what is the near-universal rule in public utility rate cases. As Professor Priest says in his work 'Principles of Public Utility Regulation,' Vol. 1, ch. 4, p. 177, 'court and commission decisions holding that contributions in aid of utility construction must be excluded from rate base have been so uniform as probably not to require detailed citation.'

"But aside from the fact that the just-cited rule is the one generally followed, there is another consideration prompting its adoption. The rule is based on principles of fairness. It is inequitable to require utility customers to pay a return on property for which they, and not the utility have paid. *City of Hagerstown v. Public Service Commission*, 217 Md. 101, 112, 141 A.2d 699, 704 (1958)." See also *State ex rel. Utility Com'n v. Heater Util., Inc.*, 288 N.C. 457, 219 S.E.2d 56 (1975); *Pichotta v. City of Skagway*, 78 F.Supp. 999, 12 Alaska 42 (D.C.1948); *Public Utilities Com'n v. Northwest Water Corp.*, 168 Colo. 154, 451 P.2d 266, 276 (1969).

In *State ex rel. Missouri Water Co. v. Public Service Commission, supra,* the court, in considering the problem the PSC has in arriving at a rate base, said, 308 S.W.2d at 720, ". . . neither impulse nor expediency can be substituted for the requirement that such rates be 'authorized by law' and 'supported by competent and substantial evidence upon the whole record.' Article V, § 22, Constitution of Missouri, V.A.M.S. For the reasons stated, we are forced to the conclusion that the order of the Commission is neither authorized by law nor supported by competent and substantial evidence upon the whole record."

■ In the instant case, it clearly appears that the action of the PSC in putting into Martigney's rate base the value of the property supplied by contributors in aid of construction after June 1, 1967, was simply an expedient method of creating a rate base. *Those* contributions in aid of construction cannot legally become part of the rate base for the reasons stated supra, and the PSC erred in considering them as such.

Martigney claims also that sec. 393.270, subd. 5, and PSC's rule 271 cannot apply retroactively to sewer companies, but can only be applied prospectively. The claim is answered by the fact that the donated property and cash connection fees as contributions in aid of construction had attained that status at the outset, and remained as such to the end of the test year, which must under *Valley Sewage* and *Du Page* be excluded for rate-making purposes. Since the utility customers have donated or paid for a substantial portion of the plant, Martigney has no vested interest so far as rate-making is concerned. The rates allowed by PSC are to be applied prospectively. No taking of property without due process of law is involved.

■ Martigney attacks PSC's finding that the value of sewer lines conveyed by developers was donated property and without consideration upon two grounds. The

first is that PSC failed to consider the effect of a trust indenture, which Martigney executed, which required it to own, operate, maintain and repair the sewer lines for the benefit of land developers to meet the requirements of the Federal Housing Administration and the Veterans Administration loan commitments. The second ground is that PSC failed to consider numerous benefits to developers in being able by reason of the existence of sewer facilities, to decrease lot sizes, to lower connection fees (the evidence was that connection fees were fixed on an estimated cost of construction of Martigney's facilities), to permit development of apartment house complexes, and to relieve subdividers of ownership, repairs and maintenance of the facilities, and to enable them to comply with FHA and VA requirements on their guarantee of loans. The arguments are without merit because, as the evidence shows, all connection fees were recovered by subdividers by adding them on to lot and residence costs paid by homeowners, and that all of these fees amount to contributions in aid of construction.

■ Martigney expenses were handled on its books in these manners: As to maintenance and service of its sewage facilities, principally performed by the Joyce Company, a charge was made on the total number of sanitary sewer connections at the end of each year, computed pro rata among the four interrelated sewer companies. The total number of actual sewer connections of all sewer companies was divided into the total number of actual connections of any one of the sewer companies, to arrive at a percentage, which was then applied to total cost of all the services. Reimbursement was made to St. Louis County Sewer Company, which had paid for all of the maintenance expenses of the four companies on the percentage basis. Martigney's pro rata share was 29.2%. Some charges were paid directly by the sewer companies. General Manager Donald C. Gillespie's salary was paid one-fifth by the Joyce Company, and the balance was prorated on the percentage basis among the four sewer companies. Consulting Sanitary Engineer Charles Gil-

lespie's fees were apportioned on a flat one-fourth to Martigney. In computing the operating expenses, PSC applied the percentage of sewer connections basis to all of them, concluding, "It is not a desirable method for many obvious reasons, however, none of the parties offered any alternative procedure. The best method would be on an actual time basis but there is no evidence in this record which could be used to make this calculation." Both St. Louis county and HBA contend that the allowance of percentage based operating expenses renders the rates allowed by PSC void because the expenses are not supported by substantial evidence, i. e., actual time records. The contention must fail. In *State ex rel. Southwestern Bell Telephone Co. v. Public Service Commission,* 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981 (1923), PSC disallowed $174,048.60 expenses paid by Southwestern Bell to A.T.&T. as rents for various items pursuant to a customary form of contract entered into by A.T.&T. and its subsidiaries. The court reversed PSC, quoting *State Public Utilities Commission ex rel. Springfield v. Springfield Gas & Electric Co.,* 291 Ill. 209, 234, 125 N.E. 891, 901 (1919): "[T]he commission is not the financial manager of the corporation, and it is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses, unless there is an abuse of discretion in that regard by the corporate officers." In *Application of Lewiston Grain Growers,* 69 Idaho 374, 207 P.2d 1028 (1949), eighteen warehousemen petitioned the Public Utilities Commission to amend the existing schedule of warehouse rates. The Commission found that expenses and revenues of public uses and those of private uses (which were not subject to its jurisdiction) were not segregated, and ordered that further action with reference to rates be held in abeyance and the cause be held open until the establishment of a uniform system of accounting by the Commission. The warehousemen argued that the time to establish the system of accounts, and the time to acquire evidence

under it, would, in that meantime, deprive them of a fair return. Citing the *Southwestern Bell* case, and others, the court said, 207 P.2d 1032, "The Commission complains that part of the segregation which the appellants make between expenses and revenues emanating from public use and those emanating from private use are based upon estimates, while appellants contend that they have resorted to estimates only as to such items as are not susceptible of a more accurate segregation, and that the estimates they have made have not been challenged. The general rule is that where more accurate information is unavailable estimates should be considered." Compare *State ex rel. Rice v. Public Service Commission,* 359 Mo. 109, 220 S.W.2d 61 (1949), where it was held that PSC's order was supported by substantial evidence as based upon a state-wide agreement among local telephone companies and Southwestern Bell Telephone Company allowing for deduction by each party in the same amount for the costs of originating and terminating toll business from gross toll revenue, then dividing the balance in proportion to the length of the toll line haul of each. There is here no suggestion of an abuse of discretion, or of bad faith, of Martigney's directors or officers in proportioning the maintenance and service costs as they did.

Martigney argues the PSC erred in disallowing its accumulated reserve as an operating expense in fixing rates. This point is directed to the PSC's action in not allowing depreciation expense on that part of Martigney's plant which was donated by developers or which came into being through contributions in aid of construction. The PSC found that the donated and contributed property equalled or surpassed the value of the plant in service and that all of the plant was contributed by the rate payer either directly (donated) or indirectly (contributions in aid of construction). The PSC said, "It would be inequitable for these same people to *again* pay for this plant through the rates charged them. This is true under either the theory that depreciation is to be used by the utility to recoup its investment or to replace the property at the end of its life. Under no theory of utility rate-making is the ratepayer expected to pay twice for the property used to serve him."

Martigney argues that sec. 393.-270(5) requires that depreciation expense on its entire plant used in the public service be allowed. The court has construed 393.-270(5) earlier in this opinion to mean that the value of the plant is one of the elements to be considered by the PSC in arriving at a rate base, but that it does not authorize the PSC to include in the rate base property donated or paid for by the rate payers by contributions in aid of construction.

Martigney further argues it must be allowed to take a depreciation expense in order that the property—sewers, etc.—can be replaced when its service life is ended. That argument seems to assume that the depreciation expense allowed would accumulate in a fund and be maintained as such to replace obsolete or worn-out sewers, or at least it assumes that depreciation is for the purpose of purchasing a replacement.

In *State ex rel. Util. Com'n v. Heater Util., Inc., supra,* the court had the same issue before it as is here presented. The North Carolina Supreme Court said, 219 S.E.2d at 62:

"The remaining question presented by this appeal is whether the Commission erred in its refusal to allow the utility company to make an annual charge to operating expenses for the depreciation of the properties representing such contributions in aid of construction. We hold that it did not err in so doing. The purpose of the annual allowance for depreciation and the resulting accumulation of a depreciation reserve is not, as is sometimes erroneously supposed, to provide the utility with a fund by which it may purchase a replacement for the property when it is worn out. The purpose of the allowance is to enable the utility to recover the cost of such property to it. In *Utilities Commission v. State* and *Utilities Commission v. Telegraph Co.,* 239 N.C. 333, 346, 80 S.E.2d 133, 142, this Court said:

" 'For rate-making purposes a public utility is allowed to deduct annually as an operating expense so much of its capital investment as is actually consumed during the current year rendering the service required of it. But the cost represents the amount of the investment, and it is the actual cost, not theretofore recouped by depreciation deductions, that must constitute the base for this allowance.' "

Kansas is a "fair value" state but in considering the depreciation element in rate-making in *Southwestern Bell Tel. Co. v. State Corp. Com'n,* 192 Kan. 39, 386 P.2d 515, 542, the court stated, "The purpose of annual depreciation is to return to the investors the amount of their investment in the original plant. It is not intended to return to the investors the cost of reproducing a new plant when the old plant has deteriorated."

And in *City of Pittsburgh v. Pennsylvania Public Util. Com'n,* 187 Pa.Super. 341, 144 A.2d 648 (1958), the court held at 657: "In no event will a utility be permitted to recover by annual allowances for depreciation a total amount in excess of the original cost, since annual depreciation is computed on original cost and not upon fair value or reproduction cost. [Citing cases.]"

In *Lindheimer v. Illinois Bell Telephone Co.,* 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182 (1934), the utility contended reduction of its claim for depreciation expense in a rate case by the Illinois Commerce Commission resulted in the confiscation of its property. The United States Supreme Court upheld the Illinois Commerce Commission and, addressing itself to depreciation expense, said at 167, 54 S.Ct. 664: "Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence. Annual depreciation is the loss which takes place in a year. In determining reasonable rates for supplying public service, it is proper to include in the operating expenses, that is, in the cost of producing the service, an allowance for consumption of capital in order to maintain the integrity of the investment in the service rendered."

In *Princess Anne Util. C. v. Commonwealth, supra,* the court upheld the actions of its State Corp. Commission which fixed the rate in a sum " 'sufficient to pay only the expenses of operating the system' " because the utility's entire plant was built by contributions in aid of construction and therefore the utility had a near-zero rate base. The court also upheld the commission in disallowing a depreciation allowance on contributed property but recognized a split of authority on that subject. The Virginia court said it believed that where depreciation is allowable, it is upon the theory that since the utility owns and must ultimately replace the property it should be entitled to a reasonable depreciation allowance as part of its operating expense to build up a reserve against the day when replacement must occur.

The Virginia court in *Princess Anne* went on to say: "Where depreciation is not allowed on contributed property, the rationale is that depreciation is designed to permit the utility to recoup its investment in plant, and where there is no investment because the property has been contributed, there is nothing to be recovered."

In *Du Page Utility Company v. Illinois Commerce Com'n, supra,* the court affirmed the order of the Illinois Commerce Commission which disallowed contributed property from the rate base but which did allow a depreciation allowance on contributed property. The allowance of depreciation was upheld on the rationale that Du Page would be required to *replace* from time to time properties which have become obsolete or whose useful lives have expired in order to sustain service to its customers. The Illinois court relied upon *Langan v. West Keansburg Water Co.,* 51 N.J.Super. 41, 143 A.2d 185 (1958), which was a suit to compel the utility to extend its lines into a new area. The court upheld its commission order saying the plaintiff (land developer) failed to demonstrate that the utility should be required at its own expense to extend

the water mains. The issue in the case was whether the land developer should be required to pay the cost of extending the lines and the court upheld the commission's order which denied the extension unless the developer paid for the extensions. As the court developed the issues in its opinion, the subject of depreciation expense arose. The New Jersey court followed earlier cases which held that the utility could not put contributed property into the rate base for the purpose of arriving at a base upon which the utility is permitted to earn a return. As to depreciation, the New Jersey court cited a New Jersey statute, R.S. 48:2–18, N.J.S.A., which allows the Board of Public Utility Commissioners to fix and determine adequate rates of depreciation, and as to such depreciation rates the utility is required to maintain those moneys so provided for out of earnings in a depreciation *fund*. That fund cannot be expended for any purpose other than depreciation, improvements, new construction, extensions, or additions to the property of the public utility.

Section 393.240, RSMo 1969, is similar, but not identical, to the New Jersey statute noted supra, and provides:

"1. The commission shall have power, after hearing, to require any or all gas corporations, electrical corporations, water corporations and sewer corporations to carry a proper and adequate depreciation account in accordance with such rules, regulations and forms of account as the commission may prescribe.

"2. The commission may, from time to time, ascertain and determine and by order fix the proper and adequate rates of depreciation of the several classes of property of such corporation, person or public utility. Each gas corporation, electrical corporation, water corporation and sewer corporation shall conform its depreciation accounts to the rates so ascertained, determined and fixed, and shall set aside the moneys so provided for out of earnings and carry the same in a depreciation fund and expend such fund only for such purposes and under such rules and regulations, both as to origi-

nal expenditure and subsequent replacement, as the commission may prescribe. The income from investments of moneys in such fund shall likewise be carried in such fund."

*State ex rel. Empire Dist. Electric Co. v. Public Service Commission,* 339 Mo. 1188, 100 S.W.2d 509 (1936), is the only case found which deals with sec. 393.240 and there only in a negative sense. By negative sense is meant that *Empire District* held the PSC could not order the utility to replace moneys it had transferred out of a depreciation reserve and used to pay dividends back into the depreciation reserve fund where the depreciation reserve fund was *not* ordered by the commission. Nevertheless, the case makes clear that a depreciation reserve generally consists of an account that belongs to the utility and is usable by the utility to pay dividends. In short, the *Empire District* case recognizes that a depreciation expense really operates so as to free-up a portion of a utility company's revenues so as to provide a surplus out of which the company can make a return to its stockholders on their investments (dividends) or acquire additional physical assets which, if so acquired, become properties paid for by the company and become part of the base upon which the company is entitled to a return to the same extent as if the additional assets were acquired by new investments by stockholders. *Empire District* recognizes that generally a reserve for depreciation is exactly what the North Carolina Supreme Court said it was in *State ex rel. Utility Com'n v. Heater Util. Inc., supra,* where the court held that the purpose of depreciation was to allow the utility to recover the cost of the assets which it had originally paid for by its funds or investment capital.

■ Our statute, sec. 393.240, *supra,* permits, but does not require, the PSC to order a utility to maintain a particular type of depreciation fund with the expenditure out of that fund being controlled by the PSC. In the instant case, the PSC did not allow for a general depreciation expense in set-

ting the rate nor did it order the utility to maintain a depreciation fund under 393.240.

The reason the PSC gives for not allowing depreciation expense is that Martigney should not be allowed to utilize depreciation expense to recoup an investment that neither it nor its stockholders ever made. The rate payers donated or by contributions in aid of construction paid for the assets upon which Martigney wants to take a depreciation expense. This, the PSC decided, would require the rate payers to pay twice for the property used to serve them and under no theory of utility rate-making is that expected of the rate payers.

Thus, it seems clear that the PSC considered the depreciation allowance sought by Martigney to be for the purpose of creating a surplus out of which the utility could pay dividends or purchase new and additional assets and disallowed the depreciation because the property had already been donated or contributed by the rate payers. It also is apparent that the PSC did not deem it necessary to require the utility to maintain a fund of the type mentioned in sec. 393.240.

 The order of the PSC disallowing depreciation on Martigney's property which was donated or provided by contributions in aid of construction was not illegal, capricious or arbitrary.

During oral argument it was suggested that if a purchaser bought the assets of Martigney and paid a sum equal to the value of its property used and useful in the public service—$1,375,161—that the purchaser would then have a rate base at the purchase price value and would be entitled to have a rate by which it, purchaser, would earn a fair return on purchaser's investment. It was suggested that if such were the case, then Martigney ought to have a rate which provides a fair return on all of its property including donated plant and that acquired by contributions in aid of construction.

The premise in the suggestion noted above that the purchase price automatically becomes the rate base simply because someone paid that sum to Martigney is not necessarily correct.

 The sale, transfer, or disposition of a sewer utility's franchise, works, or system, or any part thereof used or useful in the performance of its duties to the public is subject to control by the PSC (sec. 393.-190) and, of course, the valuation of a utility's property for rate-making purposes is also the duty of the PSC (sec. 393.230).

In Priest, "Principles of Public Utility Regulation", Vol. 1, ch. 4, pp. 188–190, it is said, "When public utility property is acquired by another public service company, should any cost of acquisition in excess of 'the cost of such property to the person first devoting it to public service' be included in an original-cost rate base? Regulatory agencies which have said 'No' constitute a majority, but there is much respectable authority to the contrary. If the transaction was at arm's-length, if it resulted in operating efficiencies, if it received regulatory approval as having been in the public interest, if it made possible a desirable integration of facilities, the 'excess' over original cost was capital dedicated to the public service. And that capital would seem entitled to amortization out of operating expenses, rather than 'below the line,' or out of income. That burden of proof may be onerous, but it has been met."

 The question is not directly involved in this case because no sale of assets has taken place and the court will not speculate on a hypothetical situation. Suffice it to say that more is involved in the valuation for rate-making purposes of an asset acquired from one utility by another utility at a price substantially in excess of its cost to the utility first donating the asset to public purpose than merely the sales price.

While it may appear that the rulings of this court in this case seem harsh with respect to Martigney, it must be borne in mind that the principal objective of Martigney is to obtain a monetary return on assets it never paid for from the very people (rate payers) who already have paid for them through donations or contributions in aid of

construction by way of inserting the value of those assets into the rate base and/or by obtaining depreciation allowances in order to obtain that same result which allowances have not been found by the PSC to be needed in order to maintain the asset in public use.

The court has held supra that the value of the plant built by connection fees (contributions in aid of construction) received after June 1, 1967, cannot be part of the rate base even though the utility treated the connection fees as operating revenue on which income taxes were paid. The court cannot discern from the record whether, as a result of the payment of income taxes, there was a reduction in the amount of money derived from connection fees so as to have required the utility to make up the difference out of its own moneys in order to build the plant, or if the valuation of plant, as found by the PSC represents plant built with the net amount of connection fees after deducting from the gross connection fees the income tax attributable thereto. To the extent that the utility invested moneys other than net connection fees in the building of that part of its plant, the utility should have that portion of plant value considered for rate-making purposes. The PSC can resolve this issue on remand.

Those parts of the circuit court's judgment affirming the PSC's disallowance of donated plant and contributions in aid of construction prior to June 1, 1967, and disallowing depreciation on these assets and its allowance of percentage allocations of operating expense are affirmed. That part of the circuit court's judgment affirming the PSC's order which included contributions in aid of construction received after June 1, 1967, in the base for rate-making purposes is reversed and the cause is remanded to the circuit court with directions to further remand the cause to the PSC for further proceedings and the setting of just and reasonable rates without including the contributions in aid of construction received after June 1, 1967, which are the subject of this appeal in the rate base.

All of the Judges concur.