BOYD, Chief Justice.
This case is before the Court upon two separate petitions for review of a decision of the District Court of Appeal, Second District, reported as Sarasota County v. Tamaron Utilities, Inc., 429 So.2d 322 *349 (Fla. 2d DCA 1983). The decision provided a construction of the fourteenth amendment to the United States Constitution and article I, section 9 of the Florida Constitution. We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.
Tamaron Utilities, Inc. (Tamaron), a public utility providing water and sewer service, applied to the Sarasota County Commission for permission to increase its monthly rates for sewage disposal. Ta-maron is a subsidiary of U.S. Homes, Inc., the developer of the subdivision served by Tamaron. U.S. Homes provided Tamaron with the capital assets necessary to operate the sewerage system and recouped its investment by passing the cost on to purchasers of homes in the subdivision. When capital assets of a utility are in effect provided by the customers, they are called “contributions in aid of construction” (CIAC). It is important to distinguish such “contributed” capital assets from other assets of the company used in its water and sewer operation, which will be referred to as “noncontributed.” Because practically all of its capital assets were obtained by means of such contributions, Tamaron is a zero rate-base utility. Since there was no rate base on which Tamaron was entitled to earn a rate of return, Tamaron limited its request for a rate increase to cover its operating expenses, including depreciation on noncontributed assets, and taxes.
Tamaron claimed that based on the test year ending in 1980, it would incur operating expenses in 1981 of $128,082. To cover these expenses, it asked for a rate increase to $20.91 per month per customer for sewer service. Tamaron included in its estimate of operating expenses $6,000 for repairs, $10,000 for maintenance, $2,000 for miscellaneous maintenance, and, the main contested item in this case, $23,530 for what was initially labeled as a “reserve contingency account.”
At the rate hearing Tamaron claimed that the reserve contingency account was necessary for unforeseen expenses since all of its estimated revenue was matched dollar for dollar with expenses requiring a cash outlay. Tamaron arrived at the figure of $23,530 by multiplying the value of contributed assets ($588,243) by a depreciation factor of four percent.
A rate analyst for Sarasota County agreed that Tamaron had a negative rate base and was therefore limited to a rate increase sufficient to cover its operating expenses, depreciation on noncontributed property, and taxes. The rate analyst calculated Tamaron’s estimated operating expenses for 1981 to be $90,583. In arriving at his calculations, the rate analyst alloted only $14,600 for repairs and expenses and nothing at all for a reserve contingency fund. He testified that the county’s legal department had issued an opinion that the reserve contingency fund was actually an allowance for depreciation on contributed property, which was prohibited by County Ordinance 80-62. Section 8(e) of that ordinance provides:
(e) The Board has the duty and authority to determine and fix reasonable rates and charges that may be charged'by any public utility for its services. The Board shall determine and investigate the actual original cost of the property of each public utility actually used and useful in public service and shall keep a current record of the net investment of each utility in such property. The value as so determined by the Board shall be used for rate-making purposes, less accrued depreciation and shall not include any contribution in aid of construction or any good will or going-concern value. The Board shall fix and determine a rate which allows for reimbursement of operating costs including depreciation on all properties, excluding contributed properties, and a fair and reasonable net return on the original cost of a system incurred by the person first dedicating it to public service, which shall not include contributions in aid of construction or customer contributions.
The Sarasota County Commission adopted a resolution finding that the rates and charges presented by its rate analyst were fair and reasonable and authorized *350 Tamaron to increase its rates to $15.84 per month per customer.
Tamaron filed a petition for writ of cer-tiorari with the circuit court, seeking to have the ordinance declared unconstitutional. The circuit court granted the motion of the Tamaron Homeowners Association and others to intervene. After hearing arguments on the petition and Sarasota County’s response, the circuit court granted the petition for writ of certiorari, holding that section 8(e) was invalid and violative of the due process and equal protection clauses of the state and federal constitutions. The circuit court then ordered that the phrase “excluding contributed properties” contained in the fourth sentence of section 8(e) be deleted from the ordinance so that Ta-maron could claim depreciation on contributed property as an operating expense.
Sarasota County, Tamaron Homeowners Association, and others filed petitions for writ of certiorari with the second district court of appeal, which consolidated the cases. The district court of appeal stated that there was no constitutional requirement that a utility be allowed to build up a reserve fund to cover depreciation losses, but that depreciation of contributed property should be considered at some point in the rate-making process. The district court construed section 8(e) as prohibiting the inclusion of CIAC depreciation in the rate base calculation by way of an add-back. 429 So.2d at 327. The district court concluded that the entire ordinance was confiscatory and violative of due process since it completely prohibited the consideration of CIAC depreciation in the rate-making process.
The issue in this case is whether an ordinance which prohibits the inclusion of CIAC property in the rate base and prohibits the consideration of depreciation of such property as an operating expense deprives a utility of its property without due process of law. In analyzing this ordinance, we must therefore examine its impact upon the rate base and operating expenses. We must then determine whether the impact necessarily results in unjust and unreasonable rate.
We begin by noting that in utility rate-making cases, a utility’s rate base is arrived at by determining the original cost of the property used in providing the service. This original cost figure is periodically adjusted downwards as the value of the property depreciates. The rate base is then multiplied by a percentage factor denoted as the rate of return. The purpose of this calculation is to estimate the amount of equity investors have in the utility and the amount of return they should get on their investment. Since investors do not have an equity interest in property contributed to a utility and therefore are not entitled to earn a rate of return on such property, it would be unfair to the customers to include contributed property in the rate base. State ex rel. Utilities Commission v. Heater Utilities, Inc., 288 N.C. 457, 219 S.E.2d 56 (1975); Princess Anne Utilities Corp. v. Commonwealth ex rel. State Corp. Commission, 211 Va. 620, 179 S.E.2d 714 (1971). Hence the various states have been uniform in holding that contributions in aid of construction should be excluded from the rate base. 1 A. Priest, Principles of Public Utility Regulation 177 (1969).
In Westwood Lake, Inc. v. Dade County, 264 So.2d 7 (Fla. 1972), we acknowledged the constitutionality of ordinances that exclude contributions in aid of construction from the rate base. We also held that “there can of course be an unconstitutional application of the ordinance as to a utility if it deprives that utility of a fair rate and thereby deprives the utility of its property without due process of law.” Id. at 9 (emphasis in original).
In this ease, however, we are not concerned with the constitutionality of the ordinance as applied. Both the circuit court and the district court of appeal found the ordinance unconstitutional on its face. The district court of appeal held the entire ordinance unconstitutional by construing it to prohibit any consideration of contributed property or depreciation on contributed *351 property as part of the rate base as well as prohibiting the allowance of depreciation of contributed property as an operating expense.
We disagree with this construction of the ordinance. To better explain, we must first examine the concept of adding back depreciation on contributed property to the rate base. We examined this concept in State v. Hawkins, 364 So.2d 723 (Fla. 1978), where the Public Service Commission calculated a utility’s rate base by taking the total value of all the utility’s property, subtracting the accumulated depreciation on both contributed and noncontributed assets, subtracting the value of the contributed property, and then adding back the accumulated depreciation on the contributed property. This method of subtracting the depreciation of contributed property and then adding it back is the same as calculating the rate base by taking the value of the non-contributed property and subtracting the accumulated depreciation on only that property. See Citizens v. Florida Public Service Commission, 399 So.2d 9 (Fla. 1st DCA 1981). The Public Service Commission argued that adding back the depreciation on contributed property to the rate base was therefore necessary to eliminate all influence of CIAC in the calculation of the rate base. This Court found, however, that the additional practice of allowing the utility to include the depreciation of CIAC as an operating expense had the effect of increasing the utility’s rate of return and that the adding back of depreciation of CIAC into the rate base, increasing it, would therefore result in a windfall to the utility. Thus our decision there suggested that adding back the depreciation on contributed property to the rate base from which it had previously been subtracted should be allowed only if the utility is not authorized to include depreciation on CIAC as an operating expense.
In this case, section 8(e) of Sarasota County Ordinance 80-62 provides that the original cost of the utility’s property “shall be used for rate-making purposes, less accrued depreciation and shall not include any contribution in aid of construction or any good will or going-concern value.” The key phrase here is “less accrued depreciation.” In reaching the result it did, the district court of appeal must have construed this phrase to require that the depreciation on both contributed property and noncontributed property be subtracted from the original cost of the utility’s assets. We do not believe that the language of the ordinance compels such a construction. It is obvious that the intent of the ordinance is to exclude any contributions in aid of construction from a utility’s rate base. As we have pointed out, this can be done most simply by taking the total value of the utility’s noncontributed property and subtracting the accumulated depreciation on only that property. Hence the phrase “less accumulated depreciation” would not result in an improper reduction of a utility’s rate base if it were construed as referring only to the accumulated depreciation on noncontributed property.
Moreover we note that our construction of the ordinance comports with the method actually utilized before the Sarasota County Commission in calculating Ta-maron’s rate base. In calculating Tamar-on’s rate base, both Tamaron and the county’s rate analyst presented exhibits showing that the method used to exclude CIAC from the rate base was to start with the value of Tamaron’s total property and subtract from it the value of CIAC and the accumulated depreciation of only the non-contributed property. Though the parties disagreed as to the value of Tamaron’s noncontributed property and the amount of depreciation of such property, these differences were not explained and both sides agreed that in the end Tamaron was left with a negative rate base. The negative rate base was reached by subtracting from the value of Tamaron’s noncontributed property $32,065 which represented the amount of connection fees Tamaron had collected. Although this amount was not included in the original cost of Tamaron’s property, it was properly deducted from the rate base. Christian and Missionary *352 Alliance Foundation, Inc. v. Florida Cities Water Co., 386 So.2d 543 (Fla. 1980).
We therefore conclude that the ordinance is not unconstitutional by virtue of the fact that it prohibits the inclusion of CIAC in a utility’s rate .base. However, we are now faced with the question of whether this prohibition coupled with the prohibition of including depreciation of CIAC as an operating expense is unconstitutional.
There is no question that the depreciation of a utility’s noncontributed property is properly included among its operating expenses.
Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence. Annual depreciation is the loss which takes place in a year. In determining reasonable rates for supplying public service, it is proper to include in the operating expenses, that is, in the cost of producing the service, an allowance for consumption of capital in order to maintain the integrity of the investment in the services rendered.
Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 167, 54 S.Ct. 658, 664, 78 L.Ed. 1182 (1934)(footnotes omitted). Because noncontributed property is purchased with the funds of the utility or its investors, recognition of depreciation of such property as an operating expense is necessary to maintain the integrity of the investment. As the depreciation of such property is charged as an operating expense, a corresponding amount is deducted from the rate base so that the investors will not earn a rate of return on the amount of their investment that has already been returned to them through the recognition of depreciation as an operating expense.
However, when part of a utility’s productive assets have been provided by contributions from its customers, there is no need to charge the depreciation of such property as an operating expense. “The Constitution does not require that the owner who embarks in a wasting-asset business of limited life shall receive at the end more than he has put into it.” Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 593, 62 S.Ct. 736, 746, 86 L.Ed. 1037 (1942). To permit such a utility to include such depreciation as an operating expense would allow it “to recover the cost of property for which it had invested nothing.” Mississippi Public Service Commission v. Coast Waterworks, Inc., 437 So.2d 448, 452 (Miss. 1983). See also State ex rel. Utilities Commission v. Heater Utilities, Inc.; Town of New Shoreham v. Rhode Island Public Utilities Commission, 464 A.2d 730 (R.I. 1983); Princess Anne Utilities Corp. v. Commonwealth ex rel. State Corp. Commission. We therefore conclude that a utility is not constitutionally entitled to be compensated for depreciation on contributed property as an operating expense.
However, different considerations come into play when all or practically all of the property used by a utility in providing a public service has been contributed to it. In such situations the utility is not entitled to earn a rate of return on the contributed property because it has invested nothing in obtaining the property and is therefore limited to earning enough revenue to cover its operating expenses. The problem is that if a utility’s expenditures are due before it collects its revenues, then the utility is placed in a negative “cash-flow” position. If there is insufficient working capital to cover this negative cash-flow, then the utility may be forced into desperate measures to obtain short-term financing, which might ultimately so damage the utility as to be confiscatory without increased rates. The utility might also be placed in a position where it would be unable to attract any capital for replacement of worn-out equipment resulting in a real inability to provide the required service. In such cases there might conceivably be an unconstitutional application of an ordinance prohibiting the depreciation of CIAC as an operating expense. See Westwood Lake, Inc. v. Dade *353 County. But there is no unconstitutional deprivation as long as the utility is allowed to charge rates which enable it “to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed.” Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 605, 64 S.Ct. 281, 289, 88 L.Ed. 333 (1944).
Tamaron argued before the Sarasota County Commission that it needed to deduct depreciation of CIAC as an operating expense in order to build a contingency reserve fund so that it would have funds on hand for unexpected expenditures. However, it failed to present any evidence that it needed such a fund to operate successfully. There is nothing in the record to show that Tamaron would be unable to pay for unexpected expenditures through internally generated funds or by attracting additional outside capital. We also note that the record reflects that the Commission authorized Tamaron to collect revenues to pay for maintenance and repairs. Although in theory there is a distinction between current maintenance expenses and depreciation, in reality both relate to the same phenomenon — the fact that physical assets wear out and need to be maintained or replaced. Lindheimer v. Illinois Bell Telephone Co. The allowance for maintenance and repairs may not only be a source of funds for unexpected expenditures but may also result in prolonging the life of the utility’s property.
We therefore conclude that Sarasota County Ordinance 80-62 does not necessarily deprive a utility of its property without due process of law. We quash the decision of the district court of appeal and remand with instructions that the circuit court’s order holding the ordinance unconstitutional be vacated and for further proceedings consistent with this opinion.
It is so ordered.
ADKINS, ALDERMAN, McDONALD and SHAW, JJ., concur.
OVERTON, J., dissents with an opinion.