**Application of TAMARAC UTILITIES, Inc.**
Docket No. 74173-WS(CR). Order No. 7788.
Florida Public Service Commission.
April 27, 1977.

Howard C. Osterman,Margate, for the applicant.

Daniel Jones, West Palm Beach, Jon C. Moyle, West Palm Beach, Stanley L. Cohen, North Miami, for Tamarac President's Council, intervenor.

William Gemmill, Tamarac, for City of Tamarac, intervenor.

Joseph A. Fitzsimmons, Fort Lauderdale, for Lester and Opal Shelton, intervenors.

B. Mark Weintraub, Fort Lauderdale, for City of North Lauderdale, intervenor.

Stanley M. Danek, Tallahassee, for the commission staff.

The following commissioners participated in the disposition of this matter — PAULA F. HAWKINS, Chairman, and Commissioners WILLIAM H. BEVIS and WILLIAM T. MAYO.

BY THE COMMISSION.

Pursuant to notice the commission by its duly designated hearing examiner, Harold E. Smithers, held a public hearing on this matter in Fort Lauderdale on August 31, 1976.

The examiner's recommendations were filed and served on October 21, 1976. The parties filed timely exceptions. Oral argument thereon, by Tamarac President's Council and the applicant, was heard on February 14, 1977. Having considered all the evidence, we now enter our order.

On March 18, 1974 Tamarac Utilities, Inc. filed this request for an increase in water and sewer rates for its systems in Broward County. Public hearings were held on December 3 and 4, 1974 and April 3 and 4, 1975.

On January 15, 1975 we issued Order No. 6461, allowing the utility to increase its rates so as to provide gross annual revenues of $861,072 and $694,025 for water and sewer service, respectively, on an interim basis.

On September 9, 1975 we issued Order No. 6891, in which we determined the rate base, revenues, expenses and cost of capital of the utility. However, because we believed the utility had not adequately documented all of its contributions-in-aid-of-construction, we imputed CIAC based on the best information available; continued the interim rates authorized in Order No. 6461, and further required —

> ". . . that the utility shall within ninety days from the date hereof file a schedule, certified by a certified public accountant, setting forth by year and contributor all contributions in aid of construction reecived by the company, including, but not limited to, payments received under developer contracts, lines and/or plant facilities received by the utility as a donation from any source. The report will also include a statement as to the amount of lines and/or plant facilities transferred to the utility by the respective parent companies other than as a contribution which was written off by the respective parent companies as development costs for federal income tax purposes."

Pursuant to the above mandate, the utility filed the report (Ex. 1 to the August 31, 1976 hearing). A motion to strike the report, as well as motions to take depositions and to have a rehearing, were filed by the intervenors.

In Order No. 7120, issued February 19, 1976, we restated and clarified our requirement to review the accounting report on CIAC

submitted by the utility. In that order, we disposed of the motions of the intervenor, Tamarac President's Council, for reasons fully described in that order, and directed a further hearing limited as noted below.

## The public hearing

The purpose of this hearing was to review the audit report containing "by year and contributor, all contributions in aid of construction received by the company . . . including . . . payments . . . lines and/or plant facilities received . . . from any source." (Order No. 6891.)

The utility prefiled Exhibit 1 to enable our auditing staff to review and verify the information therein.

The utility witness (Mr. Brandt) was a certified public accountant of Price, Waterhouse Co. ("PW"), a private accounting firm retained specifically to prepare the report. We believe it is a fair summary of his testimony to state that the utility prepared schedules by years 1968 to 1972 (tr 1066) inclusive, from Account 271 (tr 1079). PW took the schedules and verified those figures against the utility-prepared schedules (tr 1066). PW reviewed all contracts for the sale of land (tr 1067), tested those in excess of $50,000 (tr 1137), and reviewed four developer agreements. These four agreements were the largest dollar amounts and were all in excess of $5,000 in CIAC (tr 1067).

The witness stated that from the data PW compiled and reviewed, CIAC was computed in the utility schedules at $35 per lot up until some unknown date in 1971, and that after the unknown 1971 date, the CIAC was computed on the basis of $423.50 per acre (tr 1070). This does not represent an increase in charges but is merely the multiplying of the number of lots, per acre, by $35 per lot.

The sum and substance of the testimony and Exhibit 1 is that the total contribution paid to and recorded by the utiliy for the calendar years 1968 to 1972, inclusive, is $793,870.

Our staff auditor agreed that the CIAC shown in Exhibit 1 was in fact received by the utility (tr 1153). It is important to note that the auditor testified that there could be CIAC not reflected in Exhibit 1 and in excess of the $793.870.

We have reviewed the testimony and record of this hearing and the previous hearings on the rate application. Based on this, we believe that the PW audit is incomplete and that more CIAC exists than is shown in the audit.

1. Order No. 6981 required a schedule setting forth all CIAC received by the company *from any source*. Exhibit 1 does not do that and, in fact, is basically a verification of a utility-prepared schedule (tr 1113, 1104) of Account 271 (tr 1082). Any errors made by the utility when it made its original entries would be carried through to the schedules used by PW. We do not believe this certified anything except those schedules.

2. PW did not use the utility tariff (tr 1083) nor the annual reports (tr 1108) in preparing Exhibit 1. Any audit would, of necessity, have to begin with those documents to determine if the utility schedules included all the connections made up to December 31, 1972 and whether each connection was charged the correct amount according to the tariff. Failure to use the tariff and annual report casts serious doubt on the completeness of the audit.

3. The number of developer agreements sampled by PW (four) was extremely small in comparison with the large number available. We note that in Docket No. 74844-WS (Service Availability Charges of Tamarac Utilities, Inc.) the utility filed 96 developer agreements of which 50 were dated prior to December 31, 1972. Even assuming that the 50 agrements are the total signed before December 31, 1972, a sample of 8% in this case, we believe, is too small.

4. In preparing Exhibit 1, PW reviewed the developer agreements for the total dollar amounts, rather than the basis on which those dollars were calculated (number of connections x connection fee (tr 1116). Further, the assumption inherent in Exhibit 1 is that the connection charges were either $35 per lot or $423.50 per acre, an assumption not supported by the facts as herein discussed.

In making the audit tests, PW used the $35 charge (tr 1070, 1132), based on total lots and compared that amount with the $793,870 booked as CIAC. Quite naturally, the two figures were substantially the same. However, Exhibit 3 shows that, in early 1971, the connection charge was increased at least twice from $35 to approximately $95, and then to $150 (see, for example, Ex. 7 in the previous hearings). We believe that the increases reflect a significant policy change in connection fees by the utility and that PW should have used the new connection charges (in conducting its test) beginning in 1971. Had it done so, it would have seen a significant difference between CIAC booked in Account 271 and the actual contribution policy of the utility. This failure lends further doubt as to the completeness of the audit.

In addition, there is evidence in this docket (Exhibit 7, previous hearings) that as early as April 1971, the utility substantially increased its CIAC. Exhibit 1 fails to show this change.

5. We believe that material deficiencies existed in the books of the utility.

   a. In Exhibit 1, Schedule 2, the CIAC value of $41,195 is imputed (tr 1112, 1113) since there were no existing utility records for that period of time.

   b. There is a significant discrepancy between the amount paid in CIAC by the parent company (Behring) as shown in Schedule 8, Exhibit 5, of the rate case — $666,457 — and the CIAC paid by the parent as shown in the present Exhibit 1 — $393,225. The difference of $271,232 was never adequately explained (tr 1101, 1103).

   c. The General Ledgers for 1968 and 1969 were not available at the time of the special "audit." Mr. Brandt, in his amended testimony, stated that, although these records are not currently available, they were for previous certified audits of the years in question and therefore they are justified in basing their current figures on those audits. We disagree primarily because these previous audits were not concerned with CIAC as such and therefore do not address themselves specifically to our previous order. We also question the relevance of a "certified statement"in regards to such a specialized utility account as CIAC. Further, the 1971 General Ledger was lost and PW had only the monthly summary sheets" or recap ledger to use to verify the transactions sampled during the period. We believe that is inadequate.

We take official notice of the annual reports filed by the company which contain the following information as to CIAC —

### Sewer
(Account 271, p. F-10)

| Year Ending | Connections | CIAC | |
|---|---|---|---|
| 12-31-68 | 0 | $ 41,195 | |
| 12-31-69 | 1,087 | $145,320 | ($133.69/conn.) |
| 12-31-70 | 5,583 | $293,374 | ($503/conn.) |
| 12-31-71 | 5,930 | $592,644 | ($99.94/conn.) |
| 12-31-72 | 5,930 | $793,870 | ($133.87/conn.) |

### Water

| Year Ending | Connections | CIAC |
|---|---|---|
| 12-31-68 | 0 | $ 0 |
| 12-31-69 | 0 | $ 0 |
| 12-31-70 | 0 | $ 0 |
| 12-31-71 | 0 | $ 0 |
| 12-31-72 | 0 | $ 0 |

Beginning with the 1971 Annual Report Schedule, F-10-A, requiring a "list of developers or contractors agreement," "connections" and "cash received" were added to the Annual Reports. The 1971 Schedule F-10-A lists 11 tap fees for water, totaling $1,290 (117.27 per tap) and 5 tap fees for sewer at $100 per bath, totaling $800.

The 1972 Annual Report, with no connections added to t' e sewer system, increased CIAC $191,125. It also reflects (Schedule F-10) CIAC as $1,300 for sewer (5 connections = $260/connection) and $73,625 for water (496 connections = $148.43/connection).

Official notice is also taken of Docket No. 71426-WS and Order No. 5237, in response to which the utility filed its "Main Extension Policy." (See Docket No. 74844-WS). The substance of this main extension policy is that, as of September 1, 1971 (a) the developer would construct and contribute all on-site water and sewer distribution/collection facilities; (b) connection charges of $150 per single family unit/$100 per apartment-unit would be paid in addition to the on-site facilities; (c) charges for tapping-fees: 5/8" meter — $60 (first 5/8" meter per customer is provided without charge); 1" meter — $150; 1½" meter — $210; 2" meter — $300; over 2" meter — cost of materials, labor, plus 10% overhead. The utility, by Exhibit 11, recognized the questionable validity of its reported CIAC, proposing, as alternatives, two methods of calculation; one reflecting an overpayment of $146,580 from the parent company, the other imputing $65,940 additional CIAC. It fails to account for any mains or "meter tap fees." Therefore, it is considered as understating the CIAC and must be rejected.

The examiner observed in his recommendation —

"In the final analysis, the unanswered question is how to build the facilities determined by staff to cost $7,674,851 with capital totalling only $5,939,301. Excluding $130,227 of customer deposits, the difference is obtaining $1.608 323 worth of plant with no investment. Assuming the $793 870 of CIAC is considered capital contributions, there is still $914,453 more plant than investment. Without further information, this unaccounted for amount should be assumed to be CIAC to the extent that it verifies staff's previous finding of $1,428,685."

The conclusions as to CIAC, as set out in Order No. 6891. are as follows —

*Rate Base*
*Water*

| | Per Company | Commission Adjustments | Commission Balance |
|---|---|---|---|
| Utility Plant | $3,469,379 | $ (38,142) | $3,431,237 |
| CIAC | $ (185,710) | $ 449,105* | $ (634,815) |

*Sewer*

| | Per Company | Commission Adjustments | Commission Balance |
|---|---|---|---|
| Utility Plant | $4,464,164 | $(220,550) | $4,243,614 |
| CIAC | $ (608,160) | $ 185,710* | $ (793,870) |

*Imputed CIAC

While we believe that the $793,870 shown in Exhibit 1 was received by the utility, for the above reasons we have serious doubts that it shows all the CIAC that should have been recorded, and that additional amounts were received which should have been recorded as CIAC.

In our conclusions that the utility has not carried the burden of proof as to CIAC, we are referring not to the $793,870, which has been adequately established, but to disproving or rebutting the indications that there should, in fact, have been more recorded by the utility.

Faced with this confusion, we believe the utility which is responsible therefor, rather than the customers, should bear the impact of the inadequacies that created this situation.

We have reviewed Order No. 6891, particularly the CIAC stated theerin, Exhibit 1 filed at the hearing on August 31, 1976, and the testimony at that hearing. On the basis of the entire record, we must find that the utility has failed to provide complete and accurate information as to CIAC paid and, therefore, the application should be denied.

In addition, it appears from the record herein that part of the company's problems lie in the fact that initially the builder was the Behring Corporation, the then parent company. Later, through corporate reorganization, the parent company and developer was Leadership Housing. Over the years the records have been retired to storage or disposed of, or, for other reasons, were not available to the auditors. To accurately reconstruct the developments of CIAC would require review and audit of each house and lot sale from the first.

The points raised by intervenors Shelton, not covered above, must be resolved in forums other than this commission. *Deltona Corporation v. Mayo, et al.,* Case No. 49,912, opinion filed February 3, 1977.

We hereby affirm and adopt the foregoing findings and conclusions.

It is therefore ordered that the application of Tamarac Utilities, Inc., 600 University Drive, Tamarac, Florida 33313, for an increase in rates for its water and sewer systems in Broward County, Florida, be and the same is hereby dismissed; and the company is hereby required to refund all monies collected under the interim rates heretofore approved, pursuant to Order No. 6461; the refund to be over the same period of time the monies were collected.

It is further ordered that a statement be filed within thirty days from the date hereof, outlining the company's proposal for accomplishing this refund and the amount of money to be refunded.

It is further ordered that service to the city of North Lauderdale be on a wholesale basis.

It is further ordered that a letter be provided each customer with the initial billing at the old rates, explaining that the application has been dismissed and the interim rates cancelled. This letter will be submitted to this commission for approval prior to issuance.

Commissioner BEVIS dissents.