364 So.2d 723 (1978)
The Citizens of the STATE of Florida, Petitioners,
v.
Paula F. HAWKINS et al., Respondents.
In re: Petition of Holiday Lake Water System, Inc.
No. 51772.
Supreme Court of Florida.
November 9, 1978.
Rehearing Denied December 22, 1978.
*724 Larry Levy, Public Counsel and C. Earl Henderson, Associate Public Counsel, Tallahassee, for petitioners.
Raymond E. Vesterby, Tallahassee, for the Florida Public Service Commission.
Stanley M. Danek and R.M.C. Rose of Myers, Kaplan, Levinson & Kenin, Tallahassee, for Holiday Lake Water System, Inc.
James L. Ade and William A. Van Nortwick, Jr. of Martin, Ade, Birchfield & Johnson, Jacksonville, for General Waterworks Corporation  Central Florida District, Jacksonville Suburban Utilities Corporation and Southern Utilities Company, amicus curiae.
SUNDBERG, Justice.
This cause is before us on petition for writ of certiorari to review a utility rate increase granted respondent Holiday Lake Water System, Inc. by the Florida Public Service Commission. We have jurisdiction pursuant to Article V, Section 3(b)(3), Florida Constitution, and Section 367.131, Florida Statutes (1977). The issue presented is whether the Commission departed from the essential requirements of law in utilizing an accounting method to determine rate base which adds back the accumulated depreciation attributable to contributions in aid of construction (CIAC).
On August 2, 1976, respondent Holiday Lake Water System, Inc. (Holiday) requested authority to increase its rates for sewer service. On September 1, 1976, the Commission entered Order Number 7409 suspending the proposed rate schedules and authorizing an interim increase in annual gross revenues from $106,459 to $189,656. Petitioners, acting through Public Counsel, were granted leave to intervene in the proceedings and filed Exceptions to the Examiner's Recommendations. On May 2, 1977, the Commission rendered Order Number 7798, granting an increase in rates sufficient to produce gross annual revenues of $219,344.
The process of setting public utility rates involves at least two essential elements: the utility's rate base and the rate of return. Rate base represents the utility property which provides the services for which rates are charged. The rate of return is a percentage figure which is applied to the rate base in order to establish a reasonable return for the utility's investors. When these two figures are multiplied the net operating income of the utility results. Operating expenses and income taxes are then added to the net operating income to calculate gross revenue. The actual rates charged the customers are determined in such a way as to allow the utility to collect this gross revenue.
In the instant case, approximately half of Holiday's capital is attributable to assets purchased with invested or borrowed capital and the other half to contributions in aid of construction. CIAC funds are collected from customers or developers to defray the expense of extending service to such new customers. Thus they represent capital outside of the utility's debt and equity capital structure. In calculating respondent's rate of return, the Commission determined the original cost of the utility's plant and subtracted the amount representing CIAC funds. The Commission also allowed respondent to claim as an operating expense depreciation upon facilities purchased from investment capital and CIAC funds. Neither of these practices is at issue in this case. What is contested by petitioners is the Commission's further practice of allowing the utility to add back into the computation of rate base a figure which represents that portion of previously deducted depreciation attributable to CIAC property. This is done because, in the Commission's words: "In order to arrive at an investment rate base, all influence of CIAC must be eliminated. To subtract CIAC and the depreciation on CIAC would amount to a double deduction." In re: Petition of Holiday Lake System, Inc., Docket Number 760555-S-CR, *725 Order Number 7798, page 7 (Fla. Pub.Ser.Comm., 1977).
Petitioners assert that the Public Service Commission's accounting practice in determining rate base is inequitable, in that it returns a portion of contributions in aid of construction into the rate base, resulting in a windfall to the utility and unjust rates to its consumers. By allowing a return on property outside of the utility's capital investment structure the Commission exceeds its jurisdiction under Section 367.081(2), Florida Statutes (1975). Respondents counter by arguing that the Commission's accounting method eliminates all influence of CIAC in its rate base calculation and accurately reflects the real investment of a utility. Respondents also argue that the instant ratemaking proceeding resulted in just and reasonable utility rates, hence the actual accounting procedures need not be scrutinized under the "end result" doctrine. Westwood Lake, Inc. v. Dade County, 264 So.2d 7 (Fla. 1972). For the following reasons, we accept petitioners' contentions.
It is the Public Service Commission's policy to include only utility investment in determining rate base. In re: Application of Florida Cities Water Company, Docket Number R-72153-WS, Order Number 5822, page 10 (Fla.Pub.Ser.Comm., 1973). Funds derived from contributions in aid of construction are not included, as they represent property acquired from the utility's customers and not from its debt and equity capital structure.
The Commission also properly allows the utility to include the accumulated depreciation of the facilities purchased from investment and CIAC funds in the rate base calculation. In this way the utility is provided with the cash necessary to replace the property as it wears out. Therefore, the total dollar amount of investment and CIAC property stays constant over time, as does the rate base. This is as it should be, since the ratepayers are paying for the cost of using up the equipment which provides services.
Section 367.081(2), Florida Statutes (1975), directs the Commission to "fix rates which are just, reasonable, compensatory, and not unjustly discriminatory," and to provide the utility with a "fair return on the utility's investment in property used and useful in the public service." We believe the Commission exceeds its authority under Section 367.081(2) and contravenes its own policy by adding back the accumulated depreciation of CIAC into the rate base calculation. This procedure reintroduces CIAC property into the rate base structure and results in a windfall to the utility, which earns a return on property other than its own, and unfairness to the ratepayers, who must pay higher rates in spite of their contributed capital.
A series of examples will clarify the Commission's error. Consider a utility with a $1,000,000 plant, with a 40-year life and a 2 1/2% annual depreciation rate. Assume further that the plant was financed half by investment capital and half by CIAC. Initially, the utility's rate base will be $500,000, calculated as follows:

Gross Utility Plant $1,000,000
 Less: Accumulated Depreciation -0-
 __________
Net Utility Plant $1,000,000
 Less: CIAC 500,000
 __________
Rate Base $ 500,000

Thus, the rate base equals the amount of debt and equity capital actually invested by the utility.
Now assume the utility is allowed to charge depreciation expense on the entire plant, including that portion funded by CIAC and, in turn, its rates are set by the Commission so as to recover this depreciation expense from the ratepayers. This is the procedure followed by the Florida Public Service Commission and is not disputed herein. After 20 years the utility's situation would be as follows:

Gross Utility Plant $1,000,000
 Less: Accumulated Depreciation 500,000
 __________
Net Utility Plant $ 500,000

It is important to note that because the utility's rates were designed to recover depreciation *726 expense, the utility will have received $500,000 in revenues over the expected life of the plant. If this cash is reinvested in the utility to improve or replace equipment, the value of the gross utility plant will rise and the proper calculation will look like this:

Gross Utility Plant $1,500,000
 Less: Accumulated Depreciation 500,000
 __________
Net Utility Plant $1,000,000
 Less: CIAC 500,000
 __________
Rate Base $ 500,000

Because the depreciation expense was reinvested in the utility, the rate base remains constant even though after 20 years the non-CIAC property has been fully used up.
Consider now the proper ratemaking treatment if the utility instead uses the cash to pay off its loans and to return the equity capital originally contributed by the owners. In this situation, after 20 years no invested capital would remain and the rate base would correspondingly go to zero:

Gross Utility Plant $1,000,000
 Less: Accumulated Depreciation 500,000
 __________
Net Utility Plant $ 500,000
 Less: CIAC 500,000
 __________
Rate Base $ -0-

The Commission errs in allowing the accumulated depreciation on CIAC to be added into this calculation. Using the above example, if the cash received for depreciation is reinvested in the utility, the Commission's procedure causes the rate base to increase by $250,000:

Gross Utility Plant $1,500,000
 Less: Accumulated Depreciation 500,000
 __________
Net Utility Plant $1,000,000
 Less: CIAC 500,000
 Add: Depreciation on CIAC 250,000
 __________
Rate Base $ 750,000

The Commission's procedure results in the rate base increasing to $750,000 even though there has been no increase in the amount of invested capital. It is noteworthy that the increase in the amount of Gross Utility Plant was not funded by an increase in the amount of invested capital; rather it was due to the reinvestment of the cash provided by the ratepayers through rates set to recover depreciation expense.
Similarly, under the Commission's approach, if the utility pays off its loans and returns all of the owner's capital the rate base would amount to $250,000 after 20 years, even though no invested capital remains.

Gross Utility Plant $1,000,000
 Less: Accumulated Depreciation 500,000
 __________
Net Utility Plant $ 500,000
 Less: CIAC 500,000
 Add: Depreciation on CIAC 250,000
 __________
Rate Base $ 250,000

On page 7 of Order Number 7798, the Commission uses the fact situation above and takes issue with petitioners' rate base calculation. It contends that after 20 years the utility would have recovered only $250,000 through depreciation, but its rate base would be zero. The crucial fact that it ignores is that the utility also would have recovered $250,000 from the assets purchased by CIAC. Assuming, as the Commission does, that none of the depreciation expense is reinvested in the utility, after 20 years the actual utility investment would be extinguished and the proper rate base would be zero.
Our decision today in no way conflicts with the ruling in Westwood Lake, Inc. v. Dade County, supra. That case held inter alia that depreciation of contributed property may be considered in rate base if necessary to prevent an unfair rate. This Court reasoned that:
[T]o disregard arbitrarily that part of a utility's equipment because it was "contributed" and to allow no recognition of its replacement ignores reality; it would only mean a raise in rates later on when it became necessary to replace it. A depreciation loss factor may be proper if necessary to prevent a resulting unfair rate, because its purpose is to save against loss and this must be anticipated.
264 So.2d at 11.
In the instant case the proper accounting method includes a depreciation loss factor *727 on contributed assets in the rate base. The problem giving rise to this dispute, unlike the situation in Westwood Lake, is the reintroduction of CIAC property into the rate base over and above its depreciation value.
Respondents would have us disregard the Commission's erroneous accounting methods because the procedures used resulted in just and reasonable rates. This "end result" doctrine was adopted in Florida in the case of Jacksonville Gas Corp. v. Florida R.R. & Public Utilities Commission, 50 So.2d 887 (Fla. 1951), in which the Court, speaking through Mr. Justice Thomas, said:
It was the commission's view that it should be "free to follow such method * * * as [it] may choose so long as the end results are rates which are just and reasonable." ... At first we were disposed to criticize such reasoning because we thought one could not evaluate a conclusion without examining the course followed in reaching it... . But upon further study we became convinced that the "end result" is to be weighed in terms of justness and reasonableness, having consideration for all circumstances that in the sphere of finances affect and influence investments of this sort.
50 So.2d at 892 (emphasis in original).
This Court has recognized the limitations of this doctrine and has noted that it
[w]as never intended to justify improper or erroneous methods or factors in the rate-making process. It operates to neutralize such irregularities where they do not appear to be serious enough to produce harmful effects in the final determination of a fair and reasonable return.
City of Miami v. Florida Public Service Commission, 208 So.2d 249, 256-257 (Fla. 1968).
We have demonstrated above that the Commission's accounting procedure results in the inclusion of CIAC property into the rate base contrary to the Commission's policy and the dictates of Section 367.081(2). Respondents have failed to produce evidence of offsetting factors which would neutralize this practice and the harmful effects that ensue from allowing utilities to earn a return on contributed capital. In the absence of such factors the rates remain unjust and unreasonable and the end result doctrine has no application.
Respondents further contend that the case of Plant City v. Mayo, 337 So.2d 966 (Fla. 1976), stands for the proposition that major changes in the Commission's ratemaking policy, such as the one at bar, must be effectuated through a rulemaking or similar proceeding in which all interested parties may be heard. We disagree with respondents' interpretation. Plant City, while expressing a preference for rulemaking proceedings in this situation,[1] states explicitly that there is no statutory or constitutional impediment to changing a traditional ratemaking practice of general statewide effect in an individual rate case, so long as interested and affected parties have a forum in which to challenge any change and the basis on which the action is taken is supported by the record.[2]
On certiorari the duty of this Court is to examine the record to determine whether the Commission's order is in accord with the essential requirements of law and whether the agency had before it competent substantial evidence to support its findings and conclusions. Florida Retail Federation, Inc. v. Mayo, 331 So.2d 308 (Fla. 1976); Shevin v. Yarborough, 274 So.2d 505 (Fla. 1973); City of Miami v. Florida Public Service Commission, supra; General Telephone Co. v. Carter, 115 So.2d 554 (Fla. 1959). Petitioners' expert witness, Mr. Ben Johnson, gave convincing testimony explaining why the Commission's accounting practice was improper and inequitable. Respondents did not cross-examine Mr. Johnson, nor did they offer rebuttal testimony. After a careful review of the record, this *728 Court is unable to find any competent substantial evidence to support the Commission's finding as to the validity of its accounting procedure. Hence the conclusion is inescapable that the actions taken by the Commission in this case departed from the essential requirements of law.
Accordingly, the writ of certiorari is granted, Order Number 7798 is quashed, and the cause is remanded to the Public Service Commission for proceedings not inconsistent with this opinion.
It is so ordered.
ENGLAND, C.J., and ADKINS and OVERTON, JJ., concur.
BOYD, J., dissents.
NOTES
[1] 337 So.2d at 972, n. 15.
[2] 337 So.2d at 975.