429 So.2d 322 (1983)
SARASOTA COUNTY, a Political Subdivision of the State of Florida, Tamaron Homeowners Association, Inc., Jacob and Gladys G. Gwynne, and Theodore and Lula I. Wildman, Appellants,
v.
TAMARON UTILITIES, INC., Appellee.
Nos. 82-1594, 82-1744.
District Court of Appeal of Florida, Second District.
February 23, 1983.
As Clarified on Denial of Rehearings April 6, 1983.
Richard E. Nelson of Nelson, Hesse, Cyril, Smith, Widman & Herb, Sarasota, for appellant, Sarasota County.
Daniel Joy, Sarasota, for appellants, Tamaron Homeowners Association, the Gwynnes and the Wildmans.
M. Joseph Lieb, Jr. of Syprett, Meshad, Resnick & Lieb, P.A., Sarasota, for appellee.
CAMPBELL, Judge.
In this petition for common law certiorari, we consider the question of whether a county ordinance which prohibits treatment of depreciation on property contributed to a utility as an operating expense deprives a utility of its property without due process in violation of article I, section 9, Florida Constitution (1980), and the fourteenth amendment to the United States Constitution.
Tamaron Utilities is a franchised public utility operating in Sarasota County. U.S. Homes, Inc., the parent company of Tamaron Utilities, built the subdivision now served by Tamaron and also provided the initial utility service.
Tamaron applied to the Sarasota County Commission for a rate adjustment. Its application included a figure of $23,500 listed as a general and administrative expense under the subcategory "reserve contingency *323 account." Tamaron explained that this figure represented the annual amount of depreciation taken on property contributed to it, commonly referred to as "CIAC" property or property contributed in aid of construction. The county commission's own rate consultant did not include a similar provision covering depreciation on property contributed to the utility in his report directed to Tamaron's application.
The county refused to allow Tamaron to utilize the depreciation on contributed property as an operating expense, citing section 8(e) of County Ordinance No. 80-62, which specifically excludes reimbursement of depreciation on contributed property as an operating expense.
Tamaron then petitioned the circuit court seeking review of the commission's decision. The court struck section 8(e) of the ordinance as violative of the due process rights secured to Tamaron by the state and federal constitutions. The court also found that violations of procedural due process and equal protection occurred during the rate hearing.
The Tamaron Homeowners Association and certain affected individuals then intervened and sought a rehearing which the circuit court denied. The homeowners and the county appealed, and this court then elected to treat that appeal as a petition for common law certiorari. We have jurisdiction pursuant to article V, section 4(b)(3), Florida Constitution (1972), and rule 9.030(b)(2)(B), Florida Rules of Appellate Procedure.
Before discussing the specific legal issue presented here, an identification and explanation of terms important in the utility rate-making process is extremely helpful.
(a) Rate Base. The Florida Supreme Court defined rate base in State v. Hawkins, 364 So.2d 723 (Fla. 1978), as representing "the utility property which provides the services for which rates are charged." 364 So.2d at 724. It is usually established by utilizing one of three primary or major methods of calculation.
The first method is original cost, defined by the Federal Power Commission as the cost of the utility plant to the person first devoting it to public use. There are several variations of this method. For example, the prudent investment method values the plant at the cost of the original investment if prudently made, see City of Miami v. Florida Public Service Commission, 208 So.2d 249 (Fla. 1968), while the historical cost variation is an estimate of the prudent investment and is used when the real cost figures are unavailable. The second method examines the fair value of the utility's property at the time of the rate inquiry and when the property is in public service. The third method uses the reproduction cost of the existing plant. 64 Am.Jur.2d Public Utilities § 138 (1972).
Neither the United States nor the Florida Constitutions require that any specific method be used to determine the rate base so long as the method does not create an unreasonable or confiscatory rate. Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). Most states, including Florida, calculate the rate base using the original cost method. Westwood Lake, Inc. v. Dade County, 264 So.2d 7 (Fla. 1972); General Telephone Co. v. Carter, 115 So.2d 554 (Fla. 1959); Jacksonville Gas Corp. v. Florida Railroad & Public Utilities Commission, 50 So.2d 887 (Fla.), cert. denied, 342 U.S. 820, 72 S.Ct. 38, 96 L.Ed. 620 (1951). But see Tampa Electric Co. v. Watson, 146 Fla. 695, 1 So.2d 739 (1941). Sarasota County Ordinance No. 80-62 by its provisions uses the original cost method for determining rate base.
(b) Rate of Return. The court in Hawkins defined rate of return as the "percentage figure which is applied to the rate base in order to establish a reasonable return for the utility's investors." 364 So.2d at 724. A public utility is, of course, entitled to a fair rate of return on invested capital. Gulf Power Co. v. Bevis, 289 So.2d 401 (Fla. 1974). Such a return inures to the benefit of the utility's investors and helps maintain the utility's financial integrity. Federal Power Commission v. Hope Natural *324 Gas Co.; Gulf Power Co. v. Bevis, 296 So.2d 482 (Fla. 1974). Additionally, a utility must be allowed to earn a rate of return sufficient to meet operating expenses. Village of Virginia Gardens v. Haven Water Co., 91 So.2d 181 (Fla. 1956).
In United Telephone Co. v. Mann, 403 So.2d 962 (Fla. 1981), the court explained the method used by the Public Service Commission in calculating a rate of return:
The method of calculating a rate of return is primarily based upon calculating the cost of investment capital. There are three main sources of investment capital: debt, preferred stock and common stock. The cost of the first two sources can be mathematically derived whereas the cost of common stock is a matter of economic judgment. Each of these costs expressed in terms of percentage is then multiplied by that particular source's capitalization ratio to achieve a weighted average. The sum of these weighted averages is the rate of return. After this figure is reached, the commission can make further adjustments to account for such things as accretion, attrition, inflation and management efficiency.
403 So.2d at 966. See also Application of St. Joseph Telephone & Telegraph Co., 19 Fla. Supp. 150 (Fla.R.R. & P.U.C. 1962). Tamaron Utilities claims that its investment capital was all CIAC property, and, therefore, it has no rate base upon which to set a rate of return so as to recoup any investment. The county's rate consultant agrees with this assertion in his report.
(c) Contributed Property or Contributions in Aid of Construction Property (CIAC). Because a public utility is entitled to a rate of return based only on invested capital, property outside the company's debt and equity capital structure is excluded. Hawkins; Westwood. Such contributions include the construction of facilities for the utility by a developer, as well as connection fees paid by customers moving into the development. Application of Tamarac Utilities, Inc., 45 Fla. Supp. 164 (Fla.P.U.C. 1977). Though not expressly applicable here, section 367.081(2), Florida Statutes (1981), contains a detailed description of CIAC property that is helpful:
any amount or item of money, services, or property received by a utility, from any person or governmental agency, any portion of which is provided at no cost to the utility, which represents a donation or contribution to the capital of the utility, and which is utilized to offset the acquisition, improvement, or construction costs of the utility's property, facilities, or equipment used to provide utility services to the public.
Here, there are connection fees as well as property contributed by the developer. Both properly form a part in any calculation of CIAC property.
(d) Operating Expenses. All legitimate expenses incurred by a utility during a test or pro forma year may be recouped. After the rate base is determined, operating expenses, along with taxes, are subtracted from the gross revenue to yield net operating income. This net return will then reveal whether the rate of return is sufficient or whether it is confiscatory.
Operating expenses may be classified via bookkeeping entry in any number of desired headings and subheadings in accordance with generally accepted accounting principles. On an income statement, depreciation expense is usually an allowable inclusion under the heading of general expenses. P. Fess & R. Niswonger, Accounting Principles (13th ed. 1981). Tamaron carries under the heading "general and administrative" expenses an item called "reserve contingency account." It contends that the amount in this account, $23,500, is an amount nearly equal to depreciation taken on CIAC property. The utility also has an additional heading "depreciation expense on noncontributed property" which, along with the reserve fund and other operating expenses and taxes, is subtracted from the gross revenue to obtain the net operating income, in this case, a negative figure. In contrast, the county's rate consultant includes depreciation on noncontributed property under the category "other expenses," but under operating expenses he includes neither a *325 reserve account nor a depreciation expense account for CIAC property.
(e) Depreciation. Depreciation is, of course, a term used to describe the gradual physical and functional decline of property used in business for the production of income. Fess & Niswonger. Section 167 of the Internal Revenue Code treats depreciation as an operating expense and allows an annual deduction in accordance with several prescribed methods.[1] I.R.C. § 167(b) (1983). With some modifications, this treatment is accorded to public utility property.[2] I.R.C. § 167(i) (1983).
For accounting and income tax purposes, the total amount of depreciation recorded and deducted cannot exceed the initial cost of the depreciable asset. Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182 (1934); Chirelstein, Federal Income Taxation § 6.07(b) (2d ed. 1979). As used in this context, cost means the historical cost and not the replacement cost of the depreciable asset. Chirelstein. Despite this reliance on the cost method, it must be noted that for federal income tax purposes, one may have a depreciable asset that "costs" nothing. The Internal Revenue Code accomplishes this by assigning a basis or cost that can be used as a starting point for depreciation deductions. For example, if one acquires an asset by gift, section 1015 of the Internal Revenue Code determines a basis for the property. J. Freeland, S. Lind & R. Stevens, Fundamentals of Federal Income Taxation (3d ed. 1981). It seems reasonable to us that if contributed property can be depreciated annually for federal income tax purposes, this depreciation ought also to be considered at some point in the rate-making process.
Courts have long focused on the end result in the rate-making process in deciding whether rates are unreasonable or confiscatory. Hope Natural Gas. Despite the consistent use of the end result method in Florida, Carter; Jacksonville Gas, it will not be followed when it results in the use of erroneous or improper methods of ratemaking. Shevin v. Yarborough, 274 So.2d 505 (Fla. 1973); City of Miami v. Florida Public Service Commission.
Section 8(e) of County Ordinance No. 80-62 provides in pertinent part:
The Board has the duty and authority to determine and fix reasonable rates and charges that may be charged by any public utility for its services. The Board shall determine and investigate the actual original cost of the property of each public utility actually used and useful in public service and shall keep a current record of the net investment of each utility in such property. The value as so determined by the Board shall be used for rate-making purposes, less accrued depreciation and shall not include any contribution in aid of construction or any good will or going-concern value. The Board shall fix and determine a rate which allows for reimbursement of operating costs including depreciation on all properties, excluding contributed properties, and a fair and reasonable net return on the original cost of a system incurred by the person first dedicating it to public service, which shall not include contributions in aid of construction or customer contributions.
This ordinance breaks down in the following manner. The board first finds the actual original cost of the utility property used and useful in public service. From that value or figure, depreciation is then subtracted. CIAC property is also excluded from this cost calculation. Next, the ordinance states that the board must then fix a rate of return which will allow: (1) recovery of operating expenses on all property except depreciation on contributed property; and (2) a fair rate of return on the original cost of the system, not including CIAC property. Therefore, it is clear that the county's rate consultant correctly followed the ordinance in excluding any depreciation *326 on contributed property as an operating expense or cost. The utility claims this depreciation on contributed property must be included in a reserve contingency account so that the utility may accumulate a fund from which it can replace its physical plant.
In Westwood Lake, Inc., the petitioner protested the exclusion from its rate base of certain customer contributions. The court remanded the case for a determination of whether the rates were confiscatory. The court said that to insure a reasonable rate, it might be necessary to include a depreciation loss factor (presumably on CIAC property) in order to accumulate a fund to meet anticipated losses. 264 So.2d at 11.
For accounting purposes, when one depreciates an asset over its useful life, the amount depreciated is recorded to the debit account called "depreciation expense" and credited to a contra asset account called "accumulated depreciation." The asset itself remains recorded in a separate debit account, and it is recorded at its original cost. It is carried like that on the books until it is finally disposed of. The asset cash account is not increased by these entries, and so depreciation itself does not automatically provide a fund for the replacement of plant assets. Chirelstein, supra, at 129; P. Fess & R. Niswonger, supra, at 245. "This misconception [that depreciation entries automatically result in the build-up of a cash reserve] probably occurs because depreciation expense, unlike most expenses, does not require an equivalent outlay of cash in the period in which the expense is recorded." P. Fess & R. Niswonger, supra, at 245-46.
Therefore, Tamaron's reserve account is actually a debit depreciation expense account and so will never actually have any cash. The only way a reserve fund could be established is by debiting the cash or other asset account for an appropriate amount. Depreciation expenses do not involve any cash outlay, and so they are not the type of expenses that a utility has a constitutional right to recoup. Therefore, there is no constitutional requirement that a utility be allowed to build up a reserve fund from depreciation expenses.[3]
In State v. Hawkins, the court found that the Public Service Commission had exceeded its authority by using a particular accounting method to determine rate base. This method first deducted CIAC property from original cost. Depreciation was also subtracted from the original cost. But, depreciation on CIAC property was then added back into the rate base calculation. The Public Service Commission also allowed depreciation on CIAC and non-CIAC property to be treated as an operating expense. In a series of calculations, the court illustrated that the utility was improperly earning a double return on contributed capital because the Public Service Commission allowed an add-back of the CIAC depreciation into the rate base calculation as well as an operating expense allowance for CIAC depreciation.
In State v. Florida Public Service Commission, 399 So.2d 9 (Fla. 1st DCA 1981), the court sustained a Public Service Commission order allowing an add-back of CIAC depreciation in the rate base calculation. There, however, the Public Service Commission had prohibited the utility from treating CIAC depreciation as an operating expense. The court noted that the allowance of the add-back actually eliminated any influence of CIAC in the rate base calculation. 399 So.2d at 11. Finally, the court concluded that disallowing CIAC depreciation as an operating expense offsets the effects of an add-back which would otherwise result in a wrongful return on contributed capital.
Therefore, three principles inherent in the utility rate-making process are clear. One, CIAC depreciation is generally, and should be, considered at some point in the rate-making process. Two, while a utility *327 constitutionally must be allowed the right to recoup its investment and its expenses, there is no constitutional requirement that a utility be allowed to do so by maintaining a reserve fund using depreciation expenses. Three, a utility may permit an add-back of CIAC depreciation into the rate base calculation or it may treat CIAC depreciation as an operating expense, but it cannot do both.
In Southeastern Development & Utility v. Board of County Commissioners, 398 So.2d 882 (Fla. 2d DCA 1981), this court examined the predecessor ordinance of County Ordinance No. 80-62 and correctly sustained its treatment of CIAC depreciation as an operating expense. We did not there examine the question of whether CIAC depreciation was also included by way of an add-back in the actual rate base calculation. Nevertheless, our holding in that case is consistent with the Public Service Commission policy sustained in State v. Florida Public Service Commission, and it avoids the problem examined by the court in Hawkins.
Section 8(e) of County Ordinance No. 80-62 clearly does not allow CIAC depreciation to be treated as an operating expense. Neither does the ordinance permit consideration of CIAC depreciation in the rate base calculation. Our reading of the ordinance leads us to the conclusion that it does not provide for the inclusion of CIAC depreciation in the rate base calculation by way of an add-back.[4] If it did so, then we would be required to grant certiorari and quash the decision of the circuit court on this point. If it is improper to allow a utility to double-dip in its use of CIAC depreciation, it is equally improper to allow a regulatory body to completely prohibit or eliminate the use of CIAC depreciation in the rate-making process.
The circuit court struck only certain words of section 8(e) of the ordinance. We, however, conclude that that is not sufficient and accordingly hold the entire section 8(e) confiscatory and violative of the due process clauses of both the Florida and United States Constitutions and accordingly strike the entire section.
We, therefore, affirm the circuit court. However, we do so not because the exclusion by a regulatory body of CIAC depreciation as an operating expense is unconstitutional per se. We do so because it is improper to completely exclude the consideration of CIAC depreciation in the rate-making process as we interpret Ordinance No. 80-62 as doing here.
Finally, regarding the procedural due process claims, the attorney for Tamaron extensively examined the county's rate consultant and isolated the key differences between the utility's financial report and the consultant's report. He could have sought a continuance if, as he claimed, the consultant's financial report was confusingly drafted. However, he did not do so. The county was certainly entitled, after this full administrative hearing, to reject the utility's report and to accept the consultant's. Therefore, we quash that portion of the circuit court's order which finds violations of procedural due process and equal protection of the law.
AFFIRMED in part and QUASHED in part.
GRIMES, Acting C.J., and SCHOONOVER, J., concur.
NOTES
[1] The straight line method, the sum of the years digits method, and the declining balance method.
[2] Such property is subject to special depreciation formulas.
[3] This does not mean, of course, that a reserve fund could not be established in some other fashion consistent with generally accepted accounting principles, nor does it mean that the practice followed by Tamaron is wrong. We mean only that such a practice is not constitutionally mandated.
[4] We do not mean to suggest that an add-back is the only manner in which CIAC depreciation may be considered in the rate base calculation.