533 So.2d 770 (1988)
ROLLING OAKS UTILITIES, INC., Appellant,
v.
FLORIDA PUBLIC SERVICE COMMISSION, Appellee.
No. 87-1070.
District Court of Appeal of Florida, First District.
July 13, 1988.
On Motion for Rehearing  Clarifying Opinion October 19, 1988.
R.M.C. Rose and John L. Wharton of Rose, Sundstrom & Bentley, Tallahassee, for appellant.
William S. Bilenky, General Counsel, and Debra Swim, Staff Attorney, Florida Public Service Com'n, Tallahassee, for appellee.
Jack Shreve, Public Counsel, and Stephen C. Burgess, Deputy Public Counsel, Office of the Public Counsel, Tallahassee, for the Citizens of the State of Fla.
*771 JOANOS, Judge.
Rolling Oaks Utilities, Inc. (the Utility) appeals a Florida Public Service Commission (the Commission) order establishing permanent water and sewer service rates. The issues presented concern the value which the Commission placed on a 12-acre sewer pond site, and the Commission's decision to apply its policy of imputing contributions in aid of construction in an amount equal to margin reserve. We affirm.
In August 1980, Beverly Hills Development Corporation purchased a 2,368 acre tract of land for $834 per acre. Because central water and sewer service was not available, the development corporation formed a utility company to serve its development. The utility, Rolling Oaks, is a wholly-owned subsidiary of Beverly Hills Development Corporation. The development corporation deeded approximately forty acres of land to its utility subsidiary, and at the utility's request, the forty acres were included in the utility's rate base at approximately $95 per acre, for a total of $4,034.
The site of the original effluent disposal ponds is the lowest land in the subdivision. After a period of service, an assessment of groundwater impacts revealed that sewage effluent was being discharged to the groundwater. Therefore, the Department of Environmental Regulation directed the utility to relocate the sewer ponds. On the recommendation of an independent engineer retained by the development corporation, the decision was made to relocate the sewer ponds to higher ground. To effect the relocation, the development corporation first secured land use approvals for use of a parcel of its land as a utility site, and then transferred twenty-four acres of its land to the subsidiary utility. There is no record evidence of a transfer of funds from the utility to its parent corporation as payment for this twenty-four acres.
The utility proposed to include twelve of these acres in its rate base at $21,500 per acre. The remaining twelve acres were excluded because they were not necessary to serve the utility's present customers. The development corporation, which has a 20-year development plan, is currently selling 300 to 400 home sites per year. As the development continues to expand, additional sewer ponds will be required. When the remaining twelve acres are put into use for the additional sewer ponds, the developer plans to have the utility include that twelve acres in its rate base at the then existing market rate. The amount requested by the utility for the first twelve acres calls for an immediate increase in rate base from $4,034 to $258,000.
On June 13, 1986, the utility applied for an increase in its rate base. At the hearing on the rate increase request, five witnesses testified regarding the value to be attributed to the land acquired by the utility for its new sewer pond site. According to the expert witness testifying for the Office of Public Counsel (OPC), the utility could transfer the sewer pond lands from the old site to the new site as an even trade. Under this proposal, the developer would receive forty acres for twenty-four acres, and the new site would be placed in the rate base at the $95 per acre value of the old site. However, OPC's expert witness recommended that the new land should be included in rate base at the developer's acquisition cost of $834 per acre. Utilization of this approach would effect an immediate $10,008 increase in the utility's rate base.
The Commission staff witness testified that the land was valued at $1,900 per acre for property tax assessment purposes. He said that raw acreage had sold in the vicinity of the subdivision for $2,000 to $6,000 per acre, and that land on the main highway adjacent to the subdivision had sold for $10,000 an acre.
Testifying for the utility were the president of the development corporation, a competing developer, and a professional land appraiser. The land appraiser valued the land at $21,500 per acre, based on sales of land within the subdivision which already had water and sewer service, in addition to other amenities. According to the president of the development corporation, the land was worth $30,000 per acre. The *772 competing developer stated he thought the land was worth $40,000 per acre.
The Commission determined the land should be valued at its original cost of $834 per acre, adjusted by an inflation factor for the period it had been held since its purchase in 1980. Based on this evaluation, the Commission included $12,408 in the rate base, rather than the $258,000 requested by the utility. In addition to a rate base increase to reflect the value of the new sewer pond site, the utility requested that its rate base increase should reflect a margin reserve allowance that does not include the contributions it will receive during the reserve period. When reserve capacity is included in the rate base, the Commission imputes contributions in aid of construction (CIAC) to reflect the expected contributions from the utility's customers during the margin reserve period. In this instance, the Commission imputed $29,233 to the margin reserve.
The focus of this appeal is the computation of the utility's rate base, and the utility's first challenge in this regard is directed to the value which the Commission placed on the 12-acre sewer pond site. Rate base represents the utility's investment in order to provide service to the public. Citizens of the State of Florida v. Public Service Commission, 435 So.2d 784, 785 (Fla. 1983). In other words, rate base represents "the utility property which provides the services for which rates are charged." State v. Hawkins, 364 So.2d 723, 724 (Fla. 1978). The rate of return which a utility may earn on its investment "is a percentage figure which is applied to the rate base in order to establish a reasonable return for the utility's investors." Id.; § 367.081(2), Fla. Stat. (1985).[1] Thus, computation of the rate base is critical to the rate-making process.
A court reviewing a decision rendered by an administrative agency does not undertake to reweigh the evidence. Rather, the court's task is "merely [to] determine whether competent, substantial evidence supports a Commission order." § 120.68(10), Fla. Stat. (1985); Pan American World Airways, Inc. v. Florida Public Service Commission, 427 So.2d 716 (Fla. 1983). Moreover, as a general rule, courts will not review conflicting evidence, or make any determination with respect to the weight of the evidence, as these are usually matters for administrative agency determination. Citizens v. Public Service Commission, 435 So.2d at 787; Boyette v. State, Professional Practices Council, 346 So.2d 598, 599 (Fla. 1st DCA 1977).
Furthermore, the regulated entity challenging Commission action bears the burden "to establish that the order of the Commission under attack is invalid, arbitrary, or unsupported by the evidence." Florida Retail Federation, Inc. v. Mayo, 331 So.2d 308 (Fla. 1976). In other words, "[i]t is the Commission's prerogative to evaluate the testimony of competing experts and accord whatever weight to the *773 conflicting opinions it deems appropriate." United Telephone Company v. Mayo, 345 So.2d 648, 654 (Fla. 1977). See also Gulf Power Company v. Florida Public Service Commission, 453 So.2d 799, 805 (Fla. 1984); Florida Retail Federation v. Mayo, 331 So.2d at 312.
In a situation somewhat akin to that existing in this case, in Florida Power Corporation v. Cresse, 413 So.2d 1187 (Fla. 1982), the court noted that the utility bears the burden to justify the reasonableness of its purchases for operation of plant. In Cresse, as in the instant case, the record reflected conflicting evidence on the point at issue. The court held that "[b]ecause the conflict is so clear, and because there is ample testimony in support of each of the positions espoused, we must defer to the PSC, in its role as fact finder, on this point." 413 So.2d at 1190. Much the same result obtained in Gulf Power v. PSC, where the court approved the Commission's rejection of the recommendations of its own staff as well as that of Gulf, because the Commission "was presented with sufficient evidence to enable it to choose a reasonable alternative." 453 So.2d at 805.
In this case, as in Gulf Power v. PSC, the Commission was presented with the testimony of competing experts. In its order, the Commission articulated its reasons for rejecting the $21,500 per acre valuation placed on the sewer pond land by the land appraiser who testified on behalf of the utility, finding the appraisal flawed, because it was not based on the land's proposed use as utility property. The Commission's order further indicates that the valuation was arrived at by comparison with four contracts for sale of residential land in the area, one of which was never consummated, and the others apparently were not arm's length transactions.
In light of the conflicting evidence offered on the land value question in the instant case, we conclude the Commission's determination of the issue constitutes a reasonable alternative within the contemplation of Gulf Power v. PSC. The Commission received evidence that the 1980 purchase price of the land at issue was $834 per acre, as well as evidence that the 1980 value of the original sewer pond site was $95 per acre. In addition, the record reflects that the land transfer was not an arms length transaction, and there is no evidence that any funds were transferred in the transaction. Due to the foregoing factors, we find the Commission's determination that the new sewer pond land should be valued at $1,073 per acre  the original price increased by the inflation factor  is a reasonable resolution of the evaluation issue, and one that is supported by competent substantial evidence.
The utility's second challenge is directed to Commission policy with respect to imputation of CIAC to margin reserve. For rate-making purposes, margin reserve represents the utility's investment in plant necessary to serve the customers to be added within the eighteen month period following the test year. Although the Commission does not have a formal rule or policy requiring a utility to maintain a reserve capacity, in given cases it makes an adjustment to a utility's rate base which, in a sense, rewards the utility for its investment in plant capacity which the utility has readily available, but not currently in use. By allowing a margin reserve increment to the rate base, the Commission permits the utility to charge its existing customers a portion of the cost necessary to have service available for future customers.
We recognize that the Commission is an administrative agency created by the legislature, and as such "the Commission's powers, duties and authority are those and only those that are conferred expressly or impliedly by statute of the State." City of Cape Coral v. GAC Utilities, Inc. of Florida, 281 So.2d 493, 496 (Fla. 1973). In carrying out its express or implied powers and duties, an administrative agency "may implement rules through incipient rule-making, e.g., through a case-by-case adjudicatory process." Florida Power Corporation v. State of Florida, et al., 513 So.2d 1341 (Fla. 1st DCA 1987). See also Florida Cities Water Co. v. Florida Public Service Commission, 384 So.2d 1280 (Fla. 1980); Anheuser-Busch, Inc. v. Department *774 of Business Regulation, 393 So.2d 1177 (Fla. 1st DCA 1981); McDonald v. Department of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977), cert. denied, 368 So.2d 1370 (Fla. 1979). In City of Tallahassee v. Florida Public Service Commission, 433 So.2d 505, 507 (Fla. 1983), the supreme court explained the treatment to be accorded evolving policy, saying:
To the extent the PSC solidifies its position on policy in a particular area, we believe such established policy should be codified by rule. However, as in the instant case, if the PSC seeks to exercise its authority on a case-by-case basis until it has focused on a common scheme of inquiry derived through experience gained from adversary proceedings, then we hold that there should be erected no impediment to the PSC's election of such course. We feel that the ad hoc pronouncements either through orders of the PSC or through decisions made after adversary proceedings should be viewed as de facto rules, or as expressed in McDonald v. Department of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977); cert. denied, 368 So.2d 1370 (Fla. 1979), "incipient policy."
In the instant case, the utility directs its second challenge to the Commission's imputation of CIAC to the margin reserve, but raises no objection to the Commission policy of allowing margin reserve as an increment to the rate base. The margin reserve represents the utility's investment in plant necessary to serve the customers to be added within the ensuing eighteen months. Connector fees for new customers form a part of any calculation of CIAC property. Sarasota County v. Tamaron Utilities, Inc., 429 So.2d 322, 324 (Fla.2d DCA 1983). Imputation of CIAC to the margin reserve is the offset which the Commission applies to the connector fees that will be paid by the utility's new customers during the eighteen month period. By the development corporation's estimate, four hundred new customers will be added within that period.[2]
Through imputation of CIAC to the margin reserve, the Commission recognizes that a part of the utility's cost for maintaining reserve capacity will be offset by the connector fees to be paid by the customers for whom the reserve capacity was kept available. Although in this case, the CIAC will exceed the margin reserve, the Commission determined that CIAC would not be imputed to the full extent to reduce the margin reserve rate base further than if no margin reserve had been allowed.
The development corporation in the instant case made a reasonable business decision to provide water and sewer services in connection with its property development. The Commission has chosen to reward the utility for its decision to have these services readily available for new land buyers/utility customers. By imputing CIAC to the margin reserve, the Commission requires the utility and future users of the utility's services to bear a part of the cost of making future services readily available. Absent this policy, existing customers would bear all of the cost of making services available to future customers.
Admittedly, the Commission's margin reserve policy has not been promulgated as a rule. Rather it is being developed through the adjudicatory process, on a case-by-case basis as circumstances warrant. The record in this case reflects that all parties were on notice with respect to the Commission policy and the manner of its application. In addition, the issue was subjected to a full adversary proceeding, in which all parties introduced evidence. The margin reserve policy is a reflection of the Commission's effort to recognize the cost to a utility of having future plant need readily available, and to allocate a portion of that cost to those future customers who will benefit from the ready availability of the services.
We find that the Commission's order was clearly explained in the adjudicative setting *775 and is supported by a record foundation. Therefore, we affirm.
MILLS and SHIVERS, JJ., concur.

ON MOTION FOR REHEARING  CLARIFYING OPINION
Appellant's motion for rehearing and request for oral argument of the opinion filed July 13, 1988, are hereby denied. However, we find appellant's exceptions to statements found on page two [see p. 771] and page eight [see p. 773] of the opinion are well taken, and therefore clarify the opinion to the extent set forth below.
Appellant takes issue with the last sentence on page two [see p. 771] and the last complete sentence on page eight [see p. 773] of the opinion, both of which sentences state that there is no record evidence of a transfer of funds from the parent corporation to the subsidiary as payment for the sewer pond site. A more precise statement with regard to this point is as follows: Mr. Robert Nixon, testifying on behalf of Rolling Oaks, stated that the utility paid $21,500 per acre for the 24-acre tract. However, the record contains no documentary evidence of payment or transfer of funds with regard to this transaction, even though the Commission expressly asked if the utility proposed to provide documentation of the price it purportedly paid for the land.
Accordingly, the language of the opinion which reads "no record evidence of a transfer of funds" and "no evidence that any funds were transferred in the transaction" is clarified to the extent recited herein. In all other respects, the motion for rehearing is denied.
NOTES
[1] § 367.081(2), Fla. Stat. (1985), provides:

(2) The commission shall, either upon request or upon its own motion, fix rates which are just, reasonable, compensatory, and not unfairly discriminatory. In every such proceeding, the commission shall consider the value and quality of the service and the cost of providing the service, which shall include, but not be limited to, debt interest; the requirements of the utility for working capital; maintenance, depreciation, tax, and operating expenses incurred in the operation of all property used and useful in the public service; and a fair return on the investment of the utility in property used and useful in the public service. However, the commission shall not allow the inclusion of contributions-in-aid-of-construction in the rate base of any utility during a rate proceeding; and accumulated depreciation on such contributions-in-aid-of-construction shall not be used to reduce the rate base, nor shall depreciation on such contributed assets be considered a cost of providing utility service. Contributions-in-aid-of-construction include any amount or item of money, services, or property received by a utility, from any person or governmental agency, any portion of which is provided at no cost to the utility, which represents a donation or contribution to the capital of the utility, and which is utilized to offset the acquisition, improvement, or construction costs of the utility property, facilities, or equipment used to provide utility services to the public. The commission shall also consider the investment of the utility in property required by duly authorized governmental authority to be constructed in the public interest within a reasonable time in the future, not to exceed 24 months.
[2] In August 1984, the utility's new service availability or connector fees went into effect. As a class of CIAC, connector fees are expressly excluded from rate base during a rate-making test period.